**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 28 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

vs.

DALLAS WILLIAMS,

       Defendant - Appellant.

No. 00-3365

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 00-CR-10068-WEB)**

Submitted on the briefs:[*]

James E. Flory, United States Attorney and Lanny D. Welch, Assistant United States Attorney, Wichita, Kansas, for Plaintiff - Appellee.

Daniel E. Monnat, Monnat & Spurrier, Chartered, Wichita, Kansas, for Defendant - Appellant.

Before **KELLY** and **ANDERSON**, Circuit Judges and **STAGG**[**], District Judge.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1 (G). The cause therefore is ordered submitted without oral argument.

[**]The Honorable Tom Stagg, Senior District Judge, United States District Court for the Western District of Louisiana, sitting by designation.

**KELLY**, Circuit Judge.

Defendant-Appellant Dallas Williams appeals from the denial of his motion to suppress pursuant to a conditional plea. He was convicted of possession with intent to distribute approximately 230 pounds of marijuana, and sentenced to thirty-seven months in prison and a three-year term of supervised release. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

Background

On April 22, 2000, at approximately 2:15 p.m., Kansas Highway Patrol Trooper Mitch Nollette stopped Mr. Williams for going seventy-six miles per hour in a seventy mile per hour speed zone. The officer, traveling westbound on Interstate 70, had used radar to clock Mr. Williams, who was traveling eastbound in a Lincoln Town Car. The officer approached the car and spoke with Mr. Williams, who was the sole occupant of the vehicle. The officer explained to Mr. Williams that he had stopped him for speeding and asked to see his license. Mr. Williams produced an Illinois driver's license that showed Mr. Williams to be a resident of Chicago. The officer noticed at the outset of the stop that Mr. Williams exhibited "exceptional or extreme" nervousness. In making his assessment of Mr. Williams' nervousness, the officer noted that Mr. Williams

spoke with a trembling voice, his upper lip would "twitch somewhat" when the officer asked a question, and his hand shook visibly when he presented his driver's license to the officer. The officer noted that Mr. Williams' nervousness never dissipated throughout the entire stop. During this initial approach to the car, the officer also observed a "walkie-talkie" type radio on the front passenger seat, several packs of cigarettes in the front interior, and a green duffle bag in the back seat. The officer recognized the radio as one commonly sold and which had a range of only one to two miles.

While handing his license to the officer, Mr. Williams stated that the car was a rental and provided the rental agreement for the car to the officer. Id. at 233. At some point during this initial approach, but while still holding the license and rental agreement, the officer inquired as to Mr. Williams' travel plans. Mr. Williams told the officer that although his sister was from Chicago, she had traveled from Chicago to Kansas City with a friend. Mr. Williams explained that his family was having an Easter gathering the following day in Denver, and due to his sister's fear of flying, he was driving to Kansas City to pick her up and bring her to Denver.

The officer brought the materials back to his patrol car and ran a routine check to ensure the license was valid, which it was. Mr. Williams' name, however, appeared nowhere on the rental agreement for the vehicle. Instead, the

rental agreement contained only the name "Steve Snobl" as a lessee and indicated that the vehicle had been rented in Phoenix, Arizona. When the officer returned to the vehicle and questioned Mr. Williams about the discrepancy on the rental agreement, he explained that Steve Snobl was his uncle and had lent the car to him for the purpose of picking up his sister. Despite the officer's indication in his testimony that Mr. Williams' nervousness, possession of a radio commonly used by people driving in tandem, unusual travel plans, and lack of authority to be in possession of the rental car caused him to be suspicious, the officer returned the license and rental agreement to Mr. Williams. In addition, the officer said something to the effect of, "Thanks a lot. We'll see you." The officer then, however, asked Mr. Williams if he would mind answering a few additional questions, to which he agreed.

The officer first asked Mr. Williams whether he was carrying any contraband or large amounts of cash to which he stated that he was not. The officer then asked if he could search the car and Mr. Williams refused. At that point, the officer informed Mr. Williams that he would detain him there until a canine unit could come and sniff the outside of the car. At around 2:30 p.m., approximately fifteen minutes after the initial stop, the canine unit arrived and eventually alerted to the trunk area of the vehicle. After obtaining the keys and opening the trunk, the officer discovered several large bales of marijuana. The

- 4 -

officer then placed Mr. Williams under arrest, and, after giving his Miranda rights, questioned him about any other individuals with whom he was traveling. Mr. Williams told the officer that he was traveling with other individuals who were driving a Jeep Cherokee. Another officer later located the other vehicle at a nearby restaurant and found a walkie-talkie type radio of the same type as that possessed by Mr. Williams in a trash can.

In what it labeled a "close call," the district court found that the officer in this case had sufficient reasonable suspicion to detain Mr. Williams for the canine sniff of the car. The district court was persuaded by the officer's descriptions of Mr. Williams' extreme nervousness. The district court found further that the officer's suspicions stemming from Mr. Williams' possession of the radio and lack of authority to be in possession of the rental car were entitled to deference in light of the officer's experience in detecting criminal activity. Mr. Williams filed a motion to reconsider asserting that a recent case, United States v. Holt, 229 F.3d 931 (10th Cir. 2000), vacated en banc, United States v. Holt, No. 99-7150, 2001 WL 1013251 (10th Cir. Sept. 5, 2001), required a finding that the questioning of Mr. Williams regarding his travel plans was unconstitutionally beyond the scope of the initial stop. The district court denied the motion, concluding that Holt did not affect "routine questions" about travel plans. In the alternative, the district court concluded that the discrepancy in the rental agreement provided a

reasonable relationship between the questioning and the scope of the stop.

On appeal, Mr. Williams argues that (1) the questioning of Mr. Williams about travel plans exceeded the scope of the initial stop for speeding, and (2) the officer lacked reasonable suspicion to detain Mr. Williams for fifteen minutes to await the arrival of the canine drug unit.

## Discussion

When reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous, United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998), and view the evidence in the light most favorable to the district court's determination. United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). On appeal, we consider the totality of the circumstances and treat the ultimate determination of reasonableness under the Fourth Amendment as a question of law which we review de novo. Hunnicutt, 135 F.3d at 1348.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S.

648, 653 (1979). We have held, however, that a routine traffic stop is more analogous to an investigative detention than a custodial arrest. Hunnicutt, 135 F.3d at 1348. "We therefore analyze such stops under the principles developed for investigative detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968)." See id. To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

I. Scope of Questioning

Mr. Williams does not question the validity of the initial stop for speeding, so only the second prong of Terry—whether the officer's actions were reasonably related in scope to the stop—is at issue in this case. Mr. Williams argues here, as he did before the district court in a motion to reconsider, that the panel decision in United States v. Holt, 229 F.3d 931 (10th Cir. 2000), requires us to rule that the officer's questioning regarding Mr. Williams' travel plans were beyond the scope of the initial stop for speeding. That decision, however, has since been vacated after a rehearing en banc. See United States v. Holt, No. 99-7150, 2001 WL 1013251, at *1 (10th Cir. Sept. 5, 2001), vacating 229 F.3d 931 (10th Cir. 2000) [hereinafter "Holt II"].

Holt II stands for the proposition that a "traffic stop based on probable

- 7 -

cause must be judged by examining both the length of the detention and the manner in which it is carried out." Holt II, 2001 WL 1013251, at *13. Mr. Williams does not argue that the questioning in this case increased the duration of the stop, but claims that questions related to his travel plans were beyond the scope of the stop and thus unreasonable even after Holt II. We are not persuaded, however, that in this case the questioning was outside the scope of the stop. When directly confronted with the issue, we have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop. See West, 219 F.3d at 1176 (stating that "questions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop'") (quoting United States v. Hernandez, 93 F.3d 1493, 1499 (10th Cir. 1996)); see also United States v. Santana-Garcia, No. 00-4087, 2001 WL 1012086, at *3 (10th Cir. Sept. 5, 2001) (quoting West, 219 F.3d at 1176); United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999), cert. denied, 528 U.S. 1176 (2000); United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999), cert. denied, 528 U.S. 1161 (2000). Though such questions do typically fall within the scope of a traffic stop, citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions. See

$404,905.00, 182 F.3d at 647 n.2 (citing Terry, 392 U.S. at 34 (White, J., concurring)). In addition, a motorist's refusal to answer routine questions may not furnish a basis for arrest, "although it may alert the officer to the need for continued observation." Terry, 392 U.S. at 34 (White, J., concurring).

Mr. Williams' argument that the questions related to travel plans were outside the scope of the stop also fails because the circumstances that developed placed the questioning within the scope of the stop. By the time the officer began this line of questioning, he already knew that the car was a rental due to his having obtained the rental agreement. While the record indicates that the officer did not yet know of the inconsistent name on the rental agreement at the time he asked about travel plans, it was reasonably within the scope of the stop to ask such questions as the officer began the process of verifying whether Mr. Williams had lawful possession of the vehicle. See Hunnicutt, 135 F.3d at 1349 (further questioning justified where the driver had no proof of legal ownership). Additionally, the officer had already observed Mr. Williams' extreme nervousness and the short-range radio on the passenger seat, two factors that, as discussed infra, contributed substantially to raising the officer's suspicions. We conclude, therefore, that the officer's questioning regarding Mr. Williams' travel plans was within the scope of the traffic stop.

II. Reasonable Suspicion

Mr. Williams next asserts that the officer had no specific, articulable facts sufficient to provide reasonable suspicion for the detention while awaiting the arrival of the canine drug unit. During a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. Hunnicutt, 135 F.3d at 1349 (internal citation omitted). In the absence of the particular individual's valid consent, an officer may expand an investigative detention only if there exists an "objectively reasonable and articulable suspicion" that criminal activity has occurred or is occurring. Id. This case does not present a question as to whether Mr. Williams gave the officer consent to the detention, as he clearly did not. As a result, we must determine whether sufficient reasonable suspicion existed to support the detention of Mr. Williams beyond the time required for the initial stop. See United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997).

In his brief, Mr. Williams attempts to distill our analysis in an effort to discount each of the individual factors relied upon by the district court. We consider it worth repeating that our analysis of whether an investigative detention is supported by an objectively reasonable suspicion of illegal activity turns on our review of the totality of the circumstances. United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995). In doing so, we "judge the officer's conduct in light of

common sense and ordinary human experience," United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997), and we accord deference to an officer's ability to distinguish between innocent and suspicious actions. Wood, 106 F.3d at 946. Reasonable suspicion, however, may not be derived from inchoate suspicions and unparticularized hunches. United States v. Sokolow, 490 U.S. 1, 7 (1989).

From the time the officer indicated that Mr. Williams was free to go to the arrival of the canine drug unit, the only significant event was Mr. Williams' refusal to allow the officer to search the rental car. From the outset, we recognize that "consideration of such a refusal would violate the Fourth Amendment." Wood, 106 F.3d at 946. Thus, our analysis turns on whether sufficient and specific articulable facts existed which, when considered together, provided the officer with reasonable suspicion of criminal activity before he asked for consent to search the vehicle.

Mr. Williams contends that the district court impermissibly relied upon the officer's observations of Mr. Williams' nervousness as a basis for finding that reasonable suspicion existed. The district court found that the "specific and detailed testimony" of the officer regarding Mr. Williams' trembling hands, shaky voice, and twitching lip displayed "uncommon and extreme" nervousness. We have held consistently that nervousness is "of limited significance" in determining whether reasonable suspicion exists. See United States v. Wald, 216

F.3d 1222, 1227 (10th Cir. 2000). Extreme and continued nervousness, however, "is entitled to somewhat more weight." United States v. West, 219 F.3d 1171, 1179 (10th Cir. 2000). Mr. Williams points to Wood, where the panel concluded that the officer's testimony as to the defendant's rapid breathing, trembling hands, and throat-clearing constituted a mere "generic claim of nervousness," and therefore discounted the nervousness as a factor in its reasonable suspicion analysis. 106 F.3d at 948. In Wood, however, the officer and the defendant engaged in casual conversation, including a discussion of the good rate the defendant had received on the rental car. Id. at 944. Thus, Wood appears to have involved the more common situation where a citizen exhibits initially "signs of nervousness when confronted by a law officer," id. at 948, but then tends to "settle down" as the traffic stop continues. See West, 219 F.3d at 1179.

In this case, the district court found credible the officer's testimony that Mr. Williams' extreme nervousness did not dissipate throughout the entire stop. Given our standard of review, the record supports the district court's finding that Mr. Williams' nervousness exceeded that of the average citizen during a routine traffic stop. While we do recognize that "[n]ervousness alone cannot support reasonable suspicion of criminal activity," United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998) (citing United States v. Fernandez, 18 F.3d 874, 880 (10th Cir. 1994)), we see no reason in this case to ignore Mr. Williams'

nervousness in reviewing the totality of the circumstances. See West, 219 F.3d at 1179.

Mr. Williams also contends that the presence of a two-way, short-range radio was too innocuous to provide any support for a finding of reasonable suspicion. The district court found that the officer knew from experience that cars traveling in tandem and transporting drugs sometimes used such radios to avoid detection by law enforcement personnel. Although, as pointed out by Mr. Williams in his brief, there are numerous legitimate uses for these types of radios, all of these uses generally involve a link to someone else in close proximity. Thus, the officer could have reasonably inferred that Mr. Williams was using the radio to communicate with individuals in a second vehicle. Coupled with this inference are the officer's training and experience that provided him with the knowledge of how drug traffickers use such devices while driving in tandem. See, e.g., United States v. Inocencio, 40 F.3d 716, 723 n.9 (5th Cir. 1994) (describing the use of two-way radios by drug smugglers). Finally, Mr. Williams' description of his travel plans to the officer were inconsistent with a need for having such a radio on the front passenger seat. While motorists might possess some items that must be "outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous," Wood, 106 F.3d at 946 (internal quotation omitted), such as a cellphone, we find that, in conjunction with the

other factors and when giving appropriate deference to a trained officer's ability to "distinguish between innocent and suspicious circumstances," United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997), the radio in this case contributed substantially to the officer's suspicion that criminal activity was afoot.

The district court found that Mr. Williams' possession of the rental car without being named in the rental agreement "contributed, to some degree" to a finding that reasonable suspicion existed. The district court also relied on the fact that the officer knew from experience that drug couriers often use a third-party rental car. In addition, the district court found it significant that the car had been rented in Phoenix, a city that the officer knew from training and experience to be "a source city for distribution of marijuana." Id. at 60. Again attempting to turn our totality of circumstances review into a form of elemental analysis, Mr. Williams claims these factors could not give rise to reasonable suspicion.

Although we have stated that "the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many of our cases upholding further questioning," United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), that language typically refers to situations where the inability to show ownership of, or, authorization to drive the vehicle gives rise to an "objectively reasonable suspicion that the vehicle may be stolen." United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994). The officer in this case asked

one question relating to the name "Steve Snobl" on the rental agreement and was told by Mr. Williams that the individual was his uncle who had rented the car in Phoenix. The remaining questions, as well as the subsequent detention of Mr. Williams, focused on whether Mr. Williams was carrying drugs in his car. Thus, although the discrepancy provided the officer with justification to detain Mr. Williams for the purpose of determining whether he was in lawful possession of the car, detention for the purpose of the canine drug sniff was justified only if the officer had reasonable suspicion that Mr. Williams was transporting drugs. See United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995) (questions regarding contraband that were concurrent with a legitimate detention were justified only on reasonable suspicion of drug activity); see also Holt II, 2001 WL 1013251 at *12 (noting that investigations of traffic violations "'are circumscribed by Terry's scope requirement'") (quoting United States v. Botero-Ospina, 71 F.3d 783, 788 (10th Cir. 1995)). But there are other contributing factors related to the discrepancy in the rental agreement that alerted the officer to the possibility of drug activity.

The officer knew from his training and experience that drug couriers often use third-party rental cars. See, e.g., United States v. Figueroa-Lopez, 125 F.3d 1241, 1244 (9th Cir. 1997) (expert testimony that use of a rental car was consistent with the practices of an experienced drug trafficker); United States v.

Finke, 85 F.3d 1275, 1280 (7th Cir. 1996) (testimony of officer describing drug courier practices). The fact that the vehicle had been rented in Phoenix also raised the officer's suspicions because, based on his training and experience, he knew Phoenix to be a "staging area for marijuana to be stored until it's ready to move east in the United States." Standing alone, a vehicle that hails from a purported known drug source area is, at best, a weak factor in finding suspicion of criminal activity. In this Circuit alone, police testimony has identified an extremely broad range of known "drug source areas." See, e.g., United States v. Nicholson, 144 F.3d 632, 638 (10th Cir. 1998) (identifying the entire West Coast as a drug source area); United States v. Scarborough, 128 F.3d 1373, 1378 (10th Cir. 1997) (Colorado); Wood, 106 F.3d at 947 (California); United States v. Garrett, 47 F. Supp. 2d 1257, 1265 (D. Kan. 1999) (Texas); see also United States v. Beck, 140 F.3d 1129, 1138 & n.3 (8th Cir. 1998) (collecting cases and noting that law enforcement officers have identified a number of drug supply states and a significant number of the largest cities in the United States as "drug source cities").

In this case, however, Mr. Williams provided an explanation of his travel plans that indicated he was coming from Denver, Colorado. Though the explanation may have been facially plausible, we cannot brush aside the officer's suspicion that arose when he compared the actual source city of the rental vehicle

to the city that Mr. Williams had identified as his point of departure. We have stated that answers to questions suggesting an individual is concealing the fact that he had rented a car in a known drug source area can "give rise to suspicion." Wood, 106 F.3d at 947; see also United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir. 1998). While in many cases these factors might arise through innocent activity, "officers need not close their eyes to suspicious circumstances." Hunnicutt, 135 F.3d at 1349.

After reviewing the rental agreement, observing the family band radio, noting Mr. Williams' nervousness, and obtaining an explanation of Mr. Williams' travel plans, the officer nonetheless told Mr. Williams that he was free to go. Mr. Williams seems to suggest in his brief that this act on the part of the officer nullified any of the suspicion that developed throughout the stop. We disagree.

The significance of an officer returning a driver's license and registration (or rental agreement) assumes paramount importance when we analyze whether an encounter between a citizen and a law enforcement officer is consensual. See, e.g., United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Hernandez, 93 F.3d 1493, 1499 (10th Cir. 1996). While we have developed a bright line in these cases, United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir.1993), Mr. Williams fails to cite any case, nor can we find any, suggesting that the return of such documentation negates an officer's objectively reasonable

suspicions developed during a traffic stop. Although the record indicates that the officer subjectively intended that Mr. Williams was free to go, the relevant inquiry in this case is based on the objective facts known to the officer, not upon the officer's subjective state of mind. See Whren v. United States , 517 U.S. 806, 813 (1996); United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). Analytically, the only problem the release of Mr. Williams creates is that it suggests ostensibly that the officer based his detention of Mr. Williams solely on his refusal to consent to the officer's request to search the vehicle. If true, this, of course, would result in an unconstitutional search. Wood, 106 F.3d at 946. But the facts of this case indicate that this is not true. Whether the officer never intended to release Mr. Williams or whether he simply changed his mind after the consensual questioning does not alter our analysis if the officer already had sufficient reasonable suspicion to detain Mr. Williams for the purpose of the canine drug search. We therefore conclude that the officer's indication to Mr. Williams that he was free to leave bears no significance in our determination of whether the officer had reasonable suspicion to detain Mr. Williams.

Finally, Mr. Williams also mentions in his brief that the presence of a single green duffle bag and several cigarette packs could not be suspicious. Though we may agree with these arguments, we note that the district court did not rely on these factors in its denial of the motion to suppress. Nor did it need to

rely on these factors. Under the totality of the circumstances, we conclude that Mr. Williams' extreme nervousness, the presence of the short-range radio, and the discrepancy in the rental agreement all provided the officer with sufficient reasonable suspicion to detain Mr. Williams for the purpose of performing a canine drug search. See United States v. Kopp, 45 F.3d 1450, 1453–54 (10th Cir. 1995); United States v. Morales-Zamora, 914 F.2d 200, 203 (10th Cir. 1990). Further, approximately fifteen minutes elapsed from the time of the initial stop to the time that the drug detection dog arrived. In the presence of reasonable suspicion of drug activity, this period of detention was not unreasonable. See United States v. Villa-Chaparro, 115 F.3d 797, 802–03 (10th Cir. 1997) (finding forty-three minute wait reasonable in view of officer's reasonable suspicion).

AFFIRMED.