**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

EDUARDO ACUÑA-RAMÍREZ,

  Defendant - Appellant

No. 02-2262
(D.C. No. CR-00-1503)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **BALDOCK**, and **McCONNELL**, Circuit Judges.[**]

A New Mexico State Police officer stopped a vehicle driven by Defendant

Eduardo Acuña-Ramírez for speeding. After issuing a citation, the officer asked

Defendant if he could search Defendant's vehicle. Defendant consented to the search.

Prior to searching the car, the officer conducted a patdown frisk of the passenger in the

car, and discovered cocaine in his pocket. Another officer then conducted a patdown

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. 34.1(G). The case is therefore ordered submitted without oral argument.

frisk of Defendant, and found more cocaine. The officers placed both Defendant and the passenger in handcuffs, and the officers called for a canine search unit to come to the scene. The canine alerted to the dashboard area of the vehicle, where the officers found a duct-taped bundle just above the glove box in the dashboard. Officers subsequently found two more bundles in the dashboard, and a third in the front quarter panel.

A federal grand jury charged Defendant in a three-count superseding indictment with conspiracy to possess with intent to distribute 50 grams and more of cocaine base, and 500 grams and more of methamphetamine, in violation of 21 U.S.C. § 846; possession with intent to distribute 50 grams and more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and possession with intent to distribute 500 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Defendant entered a conditional guilty plea, reserving the right to appeal the district court's denial of his suppression motion. The district court sentenced Defendant to seventy months imprisonment. Defendant appeals the district court's denial of his suppression motion. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

I.

On October 29, 2000, New Mexico State Police Officer Nick Ramos was parked in the center median on Interstate 40 near Albuquerque, where he was operating his stationary radar equipment as part of the police department's effort to slow down traffic near a construction project. At approximately ten minutes to midnight, Officer Ramos

2

clocked a 1989 Pontiac with Arizona license plates going 59 miles per hour in a 55 mile per hour zone. Officer Ramos activated his emergency lights, and the Pontiac pulled over into a blocked-off area of the construction zone on the left side of the road. Defendant was driving the Pontiac and co-defendant Jesus Salazar was in the front passenger seat. Officer Ramos approached the driver side window and asked Defendant for his driver's license, proof of insurance, and registration. According to Ramos' testimony, Defendant was very nervous as indicated by his cracking voice and trembling hands, and his unwillingness to look at the officer. Officer Ramos initially spoke to Defendant in English, but then switched to Spanish.

Officer Ramos told Defendant he stopped Defendant for speeding. He asked Defendant to step out of the car and stand at the front of his patrol car. After determining no warrants existed for Defendant's arrest and Defendant's documentation checked out, Officer Ramos began writing a speeding citation. While writing the citation, Officer Ramos asked Defendant where he had come from and where he was going. Defendant responded he had come from Phoenix and was headed to Santa Rosa, New Mexico, to visit a friend. Defendant was unable to provide an address or phone number for the friend, but said that he had been there once and was going to try to find his friend once he got to Santa Rosa. According to Defendant, they were going to be in Santa Rosa for two days. Defendant was nervous during this conversation, shifting from side to side, pacing, and steadying himself once on a divider.

3

Officer Ramos left Defendant standing at the front of his patrol vehicle and approached Defendant's car to get the vehicle identification number. Officer Ramos then asked Salazar, who was still sitting in Defendant's car, where they were headed. Salazar became nervous, stared straight ahead and said they were going to New Mexico. Salazar could not identify to what town they were going. He said they were going to visit his aunt and uncle in New Mexico because his aunt was ill. According to Salazar, they were going to stay in New Mexico for twenty days.

Officer Ramos returned to where Defendant was standing and told him he was going to give him a speeding ticket. Officer Ramos asked whether Defendant wanted to appear in court or pay the fine, and Defendant said he would rather pay the fine. Defendant signed the citation, acknowledging his guilt. Officer Ramos then handed Defendant the citation and all of Defendant's documentation. Defendant turned around and began walking back to his car. Officer Ramos then asked Defendant whether he was carrying any large sums of money. Defendant turned around and said no. Officer Ramos then asked if Defendant was carrying any drugs. Defendant became very nervous again. He looked away from the officer, shook his head and said no. Defendant stated he was a good person and would not do something like that. Officer Ramos asked him if he had any cocaine, methamphetamine, or marijuana. Defendant shook his head no. Officer Ramos then asked Defendant if he could search Defendant's car. Defendant consented.

Before conducting the search of the car, Officer Ramos asked Defendant whether

4

he could do a patdown frisk for weapons. Defendant agreed. Officer Ramos found no weapons or contraband on Defendant during this search. Officer Ramos then told Defendant to remain standing near his patrol vehicle. He again asked Defendant for permission to search the car and Defendant again consented. By this time, another New Mexico State Police Officer, Augustine Samaniego, arrived on the scene.

Officer Ramos then approached the vehicle and asked Salazar to exit the vehicle. During a patdown frisk of Salazar, Officer Ramos noticed a large bulge in Salazar's pocket. He requested permission to put his hand in Salazar's pocket, and Salazar consented. Officer Ramos pulled out the bulge, which turned out to be a wad of tissues or napkins. Lying on top of the wad of tissue was a ziploc baggie containing what appeared to be cocaine. Officer Ramos then arrested Salazar, and asked Officer Samaniego to frisk Defendant. During this patdown search, Officer Samaniego discovered a small vial of what appeared to be cocaine. Officer Samaniego arrested Defendant.

The officers called for canine support to search the car. While waiting for the canine unit to arrive, the officers searched the interior, undercarriage, and trunk of the vehicle. They found no drugs or weapons during these searches. Officer Ramos noticed some screws on the dashboard had fresh marks on them, as if they had been removed recently. He also found two small bags of clothing in the trunk.

The canine unit arrived and conducted a search of the car. The dog did not alert to the outside of the vehicle, but did alert to the interior dashboard area. The officers

searched the dashboard and discovered a silver duct-taped package just above the glove box in the dashboard. The Officers then took the vehicle to the New Mexico State Police office, where they found three more silver duct-taped packages. They located two packages behind the dashboard, and a third in the front quarter panel.

Following his arrest and indictment, Defendant filed a motion to suppress. At the evidentiary hearing, Defendant denied he was speeding. Instead, he claimed he had his cruise control set for 53 miles per hour. Defendant admitted he consented to the searches, but believed he had no choice but to do so. He acknowledged the officers never threatened or physically harmed him. He also admitted Officer Ramos returned his paperwork to him before he started asking him questions. The district court held both the initial traffic stop and the scope of the stop were lawful.

## II.

In reviewing the district court's denial of a motion to suppress, we view the evidence in the light most favorable to the Government. United States v. De la Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998). We accept the district court's factual findings unless they are clearly erroneous. Id. The ultimate determination of reasonableness under the Fourth Amendment is a question of law we review de novo. Id. A traffic stop is a seizure under the Fourth Amendment analyzed under the principles of Terry v. Ohio, 392 U.S. 1, 19-20 (1968). See United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). To be reasonable under the Fourth Amendment, a traffic stop must be

justified at its inception and the officer's actions during the detention must be reasonably related in scope to the circumstances which justified the interference in the first place.  Id.

A.

Defendant first argues the district court erred by finding the traffic stop was justified at its inception.  "'[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).

At the suppression hearing, Officer Ramos testified that he was trained to operate radar, that he regularly tested his radar unit, and he believed it was working properly on the day of Defendant's arrest.  Officer Ramos testified he clocked Defendant's vehicle at 59 miles per hour in a 55 mile per hour zone.  Ruling from the bench, the district court rejected Defendant's argument that no reasonable suspicion supported the initial stop. The district court specifically found Officer Ramos' testimony "credible in that regard."

Defendant now argues this finding was clearly erroneous because (1) at least one other district judge has questioned Officer Ramos' credibility in another case; (2) Officer Ramos did not mention he frisked Defendant for weapons and found nothing until confronted with his report on cross examination; and (2) Officer Ramos ticketed Defendant for speeding in a 55 mile per hour zone, but another officer who lives in the

7

area testified the speed limit where Defendant was stopped is 45 miles per hour.

Credibility findings are particularly within the district court's province. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575-76 (1985). We find nothing in the record suggesting the district court's credibility finding was clearly erroneous. A court may discount witness testimony even though the witness was not dishonest or intentionally misleading. For example, the witness may have been confused, mistaken, or had a faulty memory. Absent a finding Officer Ramos committed perjury or some kind of intentional wrongdoing in another proceeding, we are not persuaded that another court's credibility finding is even relevant to the district court's credibility finding in this case, much less undermines that finding to such a degree that it is clearly erroneous.

Nor are we concerned about the apparent discrepancies in Officer Ramos' testimony. When confronted with his report, Officer Ramos admitted he previously frisked Defendant and found no weapons or contraband. The district court was able to view Officer Ramos and decide for itself whether his conflicting testimony was due to forgetfulness, carelessness, or a more sinister reason. And Officer Mora's testimony that Defendant was stopped in a 45 mile per hour zone does not necessarily contradict Officer Ramos' testimony. Officer Ramos testified he clocked Defendant in a 55 mile per hour zone, but had to catch up to Defendant before he could pull him over. Viewing the evidence in the light most favorable to the Government, Officer Ramos clocked Defendant in a 55 mile per hour zone, but did not manage to pull him over until they were

8

in a 45 mile per hour zone. Officer Mora was not involved in the initial stop, and would not have known precisely where Officer Ramos first observed Defendant speeding. In any event, even if we assume Officer Mora is correct, Defendant's own testimony confirms he was speeding. Defendant testified he set his cruise control at 53 miles per hour. If in fact he was driving through a 45 mile per hour zone as Officer Mora believed, then Defendant was speeding, and Officer Ramos had reasonable suspicion to stop him.

B.

Defendant next argues Officer Ramos' actions during the detention were not reasonably related in scope to the circumstances which justified the interference in the first place. Defendant argues (1) Officer Ramos should not have questioned Defendant once he handed Defendant the citation and his documentation; (2) a reasonable person in Defendant's position would not have felt free to leave; and (3) Officer Ramos did not have reasonable suspicion to prolong the detention.

The district court found the officers' actions were reasonably related to the circumstances which justified the initial stop. The district court noted that officers are permitted to ask questions about where motorists are coming from and where they are going. The court found that Defendant's and Salazar's inconsistent answers to these questions "opened the door to everything else that happened thereafter." The court further found the amount of time Defendant was delayed was not unreasonable because "they had to allow for a certain amount of time to get the canine Lady on the scene," and

9

the canine search itself took a reasonable amount of time.

We agree. "[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001); see also United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc). Defendant was very nervous and was unable to provide even a general address for his destination, supposedly the house of a friend. His version of their travel plans was inconsistent with his passenger's story. According to Defendant, they were headed to Santa Rosa for two days to visit Defendant's friend. According to Salazar, who also was very nervous, they were headed to some unidentified town in New Mexico for twenty days to visit Salazar's uncle and ailing aunt. Assuming without deciding that Defendant was still "seized" for Fourth Amendment purposes after Officer Ramos returned all of his paperwork,[1] Officer Ramos had reasonable suspicion to take the minimally intrusive step of asking Defendant a few questions. See, e.g., United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir. 1995). Upon further questioning, Officer Ramos' suspicions only increased, as Defendant became even more nervous at the mention of drugs. Defendant

_____

[1] "A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996). "Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." Id. The district court made no finding on whether the traffic stop turned into a consensual encounter after Officer Ramos issued the citation and gave back all of Defendant's paperwork.

10

subsequently consented to a search of his car. Based on these circumstances, the thirty-eight minute delay between the time Ramos issued the ticket and the canine unit arrived was not unreasonable. See Williams, 271 F.3d at 1271 (fifteen minute wait for canine unit reasonable); United States v. Villa-Chaparro, 115 F.3d 797, 802-03 (10th Cir. 1997) (thirty-eight minute wait for canine unit reasonable). Because we conclude Officer Ramos had reasonable suspicion to continue questioning Defendant, we need not consider Defendant's argument that his consent to the search was vitiated by an illegal detention. Defendant has not identified any grounds other than an illegal detention to suggest his repeatedly given consent to the search was involuntary.

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
Circuit Judge

11