**UNITED STATES of America, Plaintiff,**

v.

**Arlette P. PAVARINI, Defendant.**

**No. CR.A. 04–1019901–WEB.**

United States District Court, D. Kansas.

March 3, 2005.

Steven K. Gradert, Office of Federal Public Defender—Wichita, Wichita, KS, for Defendant.

Lanny D. Welch, Office of United States Attorney—Wichita, Wichita, KS, for Plaintiff.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter came before the court on February 28, 2005, for a hearing on the defendant's Motion to Suppress Evidence (Doc. 13). The court heard the evidence and orally denied the motion at the conclusion of the hearing. This written memorandum will supplement the court's oral ruling.

### I. *Facts.*

The court finds the following facts from the evidence presented at the hearing. On August 16, 2004, Kansas Highway Patrol (KHP) Trooper John Rule was on duty in a marked KHP patrol car on Interstate 70 in Ellis County, Kansas. Rule has worked extensively in drug interdiction on I–70. He is certified as a K–9 drug dog instructor, and he had a trained drug-detecting dog with him in the patrol car. He has been involved in more than 300 large drug seizures during his tenure as a Trooper. Rule had been traveling westbound and had just turned around to head east when he noticed a 2004 Chrysler sport utility vehicle ahead of him. The Chrysler was in the right-hand (or non-passing) side of the two eastbound lanes. Rule was behind the Chrysler when he saw it drift toward the center line that divided the right and left eastbound lanes. The driver's side tires of the Chrysler were on the center line but did not cross over the line. The Chrysler then moved fairly quickly back toward the right side of the lane until its right side tires crossed about six inches over the right boundary or "fogline" of the right-hand lane. Within a few hundred yards, Rule again saw the tires of the Chrysler cross a short distance over the fog line. There was little or no wind at the time, with the weather clear and the roadway dry. This portion of I–70 for eastbound traffic was divided into two clearly marked lanes.

Rule believed the driver had violated Kansas traffic law by failing to maintain a single lane of travel. He moved into the passing lane and pulled alongside the Chrysler to see how many occupants were in the car. Rule could see only the driver—a white female. The driver looked over and held her hands up as if to ask what he wanted her to do. Rule pointed to the side of the road, motioning for her to stop. The driver of the Chrysler, defendant Arlette Pavarini, pulled over to the right shoulder of the road. Rule pulled in behind the Chrysler and turned on his emergency lights, which activated a video camera in the patrol car. The ensuing events were captured on videotape (Govt.Exh. 1).

Rule got out and approached the Chrysler on the passenger side so he would be out of the way of traffic. As he approached, he saw that the driver was lighting a cigarette, which he thought was unusual. Rule spoke to Ms. Pavarini

through the open front passenger-side window and asked for her driver's license, explaining that he stopped her because she had been drifting on the highway. Rule asked if the vehicle was hers; she replied that she had just rented it. Rule asked for the rental agreement, and as the defendant was obtaining it he engaged in conversation, asking where she was headed and how long she would be there. The defendant said she was going to New York to see her brother and that she planned to stay a week or two. Rule asked about the car, and defendant said she had rented it in Phoenix. Rule saw that the defendant was visibly nervous. Her hands were shaking and she did not make eye contact with him. Rule could see that there were about seven large suitcases and duffel bags in the back of the car. Rule was aware from his training and experience that drug traffickers frequently move drugs from the Phoenix area across I–70 towards the northeastern United States. This initial encounter between the Trooper and the defendant took approximately one minute.

After obtaining the requested documents from the defendant, Rule returned to his car to run a check on the defendant's driver's license and the rental car and to run a "Triple III" criminal history check. Rule noticed that although the defendant said she might be in New York a week or two, the rental agreement indicated the car was supposed to be returned in five days. After a few minutes, the dispatcher reported that the defendant's Arizona driver's license was valid and that Pavarini had rented the car from Dollar Rent-a-Car in Arizona. The dispatcher also reported that Ms. Pavarini had no prior criminal history for drugs. When Rule asked whether Pavarini had any criminal history at all, the dispatcher informed him that the Triple III showed several counts of prostitution. Rule was suspicious that the defendant might be involved in drug trafficking. Rule had ra-

dioed for another officer, Trooper Goheen, to assist him, and when Goheen arrived Rule explained his suspicions, citing the fact that the defendant was coming out of Phoenix going to New York to visit her brother, that she said she was going to be there a week or two but the rental agreement showed the car was due back in five days, that she was loaded down with new suitcases, that she lit up a cigarette as he approached the car, and that she was unusually nervous. Rule planned to ask the defendant to consent to search the vehicle for drugs. He finished writing up a warning citation for failing to maintain a single lane of traffic

Rule returned to the passenger side window of the Chrysler with the defendant's documents and a warning citation. He handed the papers back to the defendant and explained that he had just written her a warning and that it would not cost her any money. Rule alluded to the defendant having drifted on the highway, telling her to pull over and take a break if she got tired. She said she was sorry and explained that she had a puppy in the back, indicating she might have been reaching back to tend to the dog. When Rule reached in the car to give her back her papers, he noticed an odor of marijuana and air freshener coming from inside the car. Rule told the defendant to have a good trip, and then said to her, "Ma'am, it smells like I might be smelling marijuana here, can you tell me what I'm smelling there?" Ms. Pavarini responded, "You know what, I thought that too," but explained she thought the smell was coming from the leather seats in the car.

Rule was fairly certain that he smelled marijuana. He also saw a container of "Febreze" deodorizer sitting out in the back. He asked Pavarini if he could take a look in the car, but she responded, "Not without a warrant." Rule said he did not

need a search warrant when he could smell marijuana, and he asked the defendant to step out of the car. He directed Trooper Goheen, who by this time was standing by the side of the driver's door, to stick his head in the car and see if he could smell marijuana. After the defendant got out, Rule directed Goheen a second time to stick his head in and asked, "You smell it, don't you?" Goheen indicated that he did. As Goheen escorted the defendant to the front of the vehicle, Rule unzipped one of the bags in the back seat and immediately saw what appeared to be a brick of marijuana. He told Goheen to handcuff the defendant, and Goheen did so. Officers subsequently discovered a total of about 347 pounds of marijuana in the bags in the car.

II. *Arguments on Motion to Suppress.*

The defendant claims the initial stop of the vehicle violated the Fourth Amendment because the Trooper did not have probable cause to believe the defendant had committed a traffic violation. Defendant also claims the officer unlawfully detained her to ask her questions about contraband in the absence of any reasonable suspicion or objective evidence of drugs. Finally, defendant contends the Trooper's claim that he smelled marijuana while standing outside the car is "questionable." Defendant argues that her detention and the search were thus unreasonable under the Fourth Amendment and that the evidence found in the search should be suppressed.

III. *Discussion.*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The temporary detention of an individual for a traffic violation constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States,* 517

U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Under Tenth Circuit law, routine traffic stops are analyzed under the standards for investigatory stops in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Hunnicutt,* 135 F.3d 1345, 1348 (10th Cir.1998). The reasonableness of such stops are evaluated in two respects: first, whether the officer's action was justified at its inception, and, second, whether the stop is reasonably related in scope to the circumstances that first justified the interference. *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) (*citing Terry* ).

■ A. *The Initial Stop.* "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (*en banc* ); *accord Whren v. United States,* 517 U.S. 806, 818, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Based on the Trooper's testimony that he saw the defendant's defendant's vehicle twice cross over the fog line— which the court finds credible—the court finds the officer had probable cause to make a stop for a traffic violation. Section 8–1522(a) of the Kansas Statutes Annotated provides that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, ... vehicle[s] shall be driven as nearly as practicable entirely within a single lane." The evidence shows it would not have been impracticable under these circumstances for a driver to keep a car within a single lane, and the court thus finds the officer had probable cause to make the stop. The defendant argues at one point in her brief that the stop was "pretextual," but she also recognizes that in such circumstances

it is irrelevant for purposes of the Fourth Amendment whether the officer had some subjective motive for stopping the vehicle in addition to the traffic violation. *Whren,* 517 U.S. at 810, 116 S.Ct. 1769. In sum, the court finds the initial traffic stop of the vehicle was reasonable under the Fourth Amendment.

The court rejects as not credible the defendant's testimony that she did not cross the lane marker. The evidence leads the court to conclude that the defendant was well aware of the Trooper's presence behind her on the highway—as she testified—and that she was watching him intently in her mirror as he approached. The evidence tends to suggest that seeing the Trooper behind her on the roadway made the defendant nervous, and that her attempts to watch him in the minor combined with her nervousness may have contributed to her weaving on the highway.[1] Additionally, as the court will discuss infra, the defendant's testimony was less than credible as to other issues, which contributes to the court's finding that the officer's version of events was more credible.[2]

■ B. *Scope of the Detention.* Insofar as the appropriate scope of a traffic stop is concerned, the Tenth Circuit has consistently held that an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994). Thereafter, when the driver has produced a valid license and proof that she is entitled to operate the car, she generally must be allowed to proceed on her way without being subjected to further delay for additional questioning. *Id.* Further questioning is permissible in two circumstances, however. First, the officer may detain the driver for questioning unrelated to the initial traffic stop if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993). Second, further questioning is permissible if the initial detention has become a consensual encounter. *United States v. Dewitt,* 946 F.2d 1497, 1502 (10th Cir.1991).

■ The court finds the Trooper did not exceed the permissible scope of the traffic stop by asking Ms. Pavarini a few questions about the car and her travel plans. *Cf. United States v. Williams,* 271 F.3d 1262, 1266 (10th Cir.2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). His questions were relevant to whether the defendant lawfully possessed the rental vehicle and were also potentially germane to her reason for weaving on the highway. The questions were of a sort that any traveler might expect from others on the highway and

---

1. There is no credible evidence here that the Trooper was the direct cause of the weaving. *Cf. United States v. Ochoa,* 4 F.Supp.2d 1007 (D.Kan.1998) (in a case involving the same Trooper, the court found that the Trooper's pulling along side the defendant's car "was a significant factor in causing the momentary drift" of the defendant's car). In the instant case, the defendant had crossed over the lane line well before the Trooper pulled alongside her. His manner of driving in this case cannot be said to have caused the defendant's weaving.

2. The court notes there were some minor gaps or inconsistencies in the Trooper's testimony—such as his testimony about the point at which he turned on his emergency lights—but these largely dealt with immaterial matters. It is not surprising that a Trooper who has made hundreds or thousands of traffic stops might misrecollect a few details from a stop that occurred some six months ago. The defendant's testimony, by contrast, was implausible as to numerous issues, both minor and major.

they did not extend the traffic stop in any appreciable sense. The court further concludes that the Trooper's check on the defendant's criminal history, which was brief and unobtrusive, was within the permissible scope of the stop. *See United States v. Holt,* 264 F.3d 1215, 1221–22 (10th Cir.2001); *United States v. McRae,* 81 F.3d 1528, 1535, n. 6 (10th Cir.1996) ("the almost simultaneous computer check of a person's criminal record . . . is reasonable and hardly intrusive."). Nor did the Trooper delay or prolong the encounter beyond what was necessary to run a check and to issue a citation. There was nothing about the detention or the questioning of the defendant that was unreasonable under the Fourth Amendment.

The defendant argues that the Trooper's "questioning about contraband was 'far outside' the scope of the initial stop, . . ." Def. Mem. at 4. The evidence showed, however, that the Trooper's questions about contraband only came after he had smelled marijuana in the passenger compartment. As the court notes below, the officer had probable cause at that point to believe there was marijuana in the car. His questions about contraband were thus clearly justified by the specific facts within his knowledge. *Cf. United States v. Nichols,* 374 F.3d 959, 964 (10th Cir.2004) ("The scope of this stop was . . . permissibly expanded when police smelled raw marijuana in the vehicle."), *cert. granted and judgment vacated on other grounds by Nichols v. United States,* — U.S. —, 125 S.Ct. 1082, 160 L.Ed.2d 1054 (2005).

■ C. *The Search.* Defendant's final contention is a challenge to the Trooper's assertion that he smelled marijuana in the car prior to searching it. Defendant argues that the Trooper's credibility on this point is questionable. She points out that the Trooper had a drug detection dog with him at the scene but did not use the dog. She also argues that Trooper Rule made

several suggestions to Trooper Goheen to get him to corroborate the smell, but that Goheen did not confirm or verify the odor.

On this point it is the defendant's credibility, not the Trooper's, that is questionable. The Trooper knows from his training and experience what marijuana smells like. The court has no trouble at all believing that a 300–plus pound stockpile of marijuana in the passenger compartment of a car had a significant odor. *Cf. United States v. Gutierrez–Moran,* 125 F.3d 863 (10th Cir.1997) (Table, Text in Westlaw, (1997 WL 608777) (noting the implausibility of defendant's argument that he did not know about marijuana in his van when he "had nearly 300 pounds of marijuana in his possession—a quantity sufficient to cause emanation of a strong, distinctive smell from the back of his van"). When Rule pointed out to the defendant that he smelled marijuana coming from the car, the defendant's statement at the time was, "You know what, I thought that too," before she claimed that the smell came from the leather seats. This contemporaneous admission is in contrast to her testimony at the suppression hearing, where, despite acknowledging that she was a "product of the sixties" [i.e., 1960's], she claimed at one point that she was not sure what raw marijuana smells like. Likewise implausible was the defendant's testimony that she lit up a cigarette when the Trooper first approached simply because she was nervous. Given the evidence, it is far more likely that she was making a rather obvious attempt to mask an odor of marijuana in the car. (The same might be said for the presence of "Febreze" deodorizer in the car, which the defendant testified was there in part because her puppy sometimes "sweats.").

Trooper Rule's testimony that he smelled marijuana when he gave the documents back—an assertion corroborated by

the videotape of the incident—was credible. The fact that he chose not to use his dog at that point does not undermine his credibility. Nor does the fact that he directed Trooper Goheen to smell the car suggest that there was no odor, such conduct is entirely consistent with Rule's testimony that he thought it would be a good idea to have another witness to the odor. Moreover, the evidence leads the court to conclude that Goheen confirmed the presence of the odor the second time Rule asked him about it.

An officer's detection of the smell of drugs in a vehicle is entitled to substantial weight in the probable cause analysis. *United States v. Zabalza,* 346 F.3d 1255, 1259 (10th Cir.2003) (*citing United States v. West,* 219 F.3d 1171, 1178 (10th Cir. 2000)). The Tenth Circuit "has long recognized that marijuana has a distinct smell and that the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage.'" *Zabalza,* 346 F.3d at 1259 (citations omitted). In the instant case, the officer was not only aware of an identifiable smell of marijuana coming from the passenger compartment, he also knew that the defendant was coming from an area where drugs are frequently transported; that she was traveling with an unusually large number of bags in the car; that her stated travel plans did not match up with the return date of the automobile rental agreement; that she lit a cigarette just as the officer was approaching and had a deodorizer in the car; and that she appeared to be unusually nervous. Under the totality of the circumstances, the court concludes that the Trooper had probable cause at that point to search the vehicle. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (probable cause exists when there is a fair probability that contraband will be found). As such, the officer did not need to obtain a search warrant or to conduct further investigation before searching the vehicle. *See United States v. Oliver,* 363 F.3d 1061, 1068 (10th Cir.2004) ("Under the automobile exception, police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant."); *United States v. Parker,* 72 F.3d 1444, 1450 (10th Cir.1995) ("Once probable cause to search is established, the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband."). In sum, the court finds that the search was supported by probable cause and was reasonable under the Fourth Amendment.

### IV. Conclusion.

Defendant's Motion to Suppress (Doc. 13) is DENIED. IT IS SO ORDERED this 3rd Day of March, 2005, at Wichita, Ks.