**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 16 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellant,

v.

MARTIN PINA-ABOITE,
RAUL DEL ROSARIO SEPULVEDA,

        Defendants-Appellees.

No. 04-2036

(D. New Mexico)

(D.C. No. 03-1097 JC)

### ORDER AND JUDGMENT[*]

Before **HENRY** , **LUCERO** , Circuit Judges, and **FIGA** ,[**] District Judge.

Defendants-appellees Martin Pina-Aboite and Raul Del Rosario Sepulveda were stopped on the highway by a New Mexico police officer for what appeared to be an expired vehicle tag. Although the officer discovered that the tag was valid, he continued to question the defendants and obtained their consent to search the vehicle. The search uncovered eleven pounds of crystal

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10TH CIR. R. 36.3.

[**] The Honorable Philip S. Figa, United States District Judge for the District of Colorado, sitting by designation.

methamphetamine hidden in the gas tank. The defendants were indicted for conspiracy to possess and possession with intent to distribute over 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. Following a hearing on September 22, 2003, the district court granted the defendants' motion to suppress evidence obtained following the stop of their vehicle. On November 17, 2003, the district court granted the government's motion for reconsideration and denied defendants' motion to suppress. On March 11, 2004, the district court granted defendants' motion for reconsideration and once again granted their motion to suppress.

We hold that the police officer had no justification for detaining the defendants after the original purpose of the traffic stop was met and that the detention violated the defendants' Fourth Amendment rights. Moreover, we hold that the consent to search was not sufficient to purge the taint of the illegal detention. Accordingly, we affirm the district court's grant of the defendants' motion to suppress.

## BACKGROUND

On May 21, 2003, New Mexico Police Officer Nick Ramos was patrolling Interstate 25 north of Santa Fe and observed the defendants in a Nissan Maxima bearing a Nebraska license plate displaying the number "02." Believing that the

2

vehicle tag had expired, Officer Ramos pulled the defendants over. The camera mounted to the dashboard of Officer Ramos' police car recorded the traffic stop. The audio recording did not pick up all of the conversation because at times the audio signal was not received from Officer Ramos' body microphone. Much of the conversation transpired in Spanish, and a translator prepared a transcription of the audible portions of the tape. Officer Ramos does not speak fluent Spanish, which led to some confusion in his communications with the defendants.

As Officer Ramos walked by the rear of the car, he looked at the license plate, and he still saw only the "02" on the sticker. Officer Ramos approached the passenger side window and asked the driver, Mr. Pina-Aboite, for his license and the registration and insurance papers. Mr. Pina-Aboite handed the officer each document separately. As Mr. Pina-Aboite handed the documents to Officer Ramos, he told him that the car belonged to Mr. Sepulveda. Officer Ramos asked for Mr. Sepulveda's identification, which Mr. Sepulveda handed to him.

Officer Ramos testified that as the defendants handed over their documents, Mr. Pina-Aboite's hand was shaking, Mr. Sepulveda refused to make eye contact, and the defendants' chests were moving in an "exaggerated and definitive" manner. Aplt's App. at 40 (Tr. of Hr'g on Motion to Suppress, Sept. 17, 2003). Officer Ramos. He testified that this behavior aroused his suspicions because they indicated "very, very strong nervousness." *Id*. at 45.

3

Officer Ramos asked Mr. Pina-Aboite to get out of the car and walk to the rear. Mr. Pina-Aboite did so, and Officer Ramos explained why he had stopped the car. Mr. Pina-Aboite approached the Nissan's license plate and explained that the "02" sticker indicated the month February, not the year 2002. The officer examined the license plate and identified the year "2004" in smaller lettering alongside the "02." At that point, Officer Ramos was satisfied that there was no traffic infraction. He later testified that he "wouldn't have bothered" to stop the car had he seen that the sticker on the plate read "2004." Aplt's App. at 97.

However, Officer Ramos continued to talk to Mr. Pina-Aboite and to retain the documents that the defendants had given him. Officer Ramos testified that he did so because "there were a lot of things that, based on [his] training and experience, just wasn't [sic] right." *Id*. at 46. Officer Ramos cited "the totality of the circumstances" for his suspicions, including "everything that was said; the mannerisms; the very, very strong nervousness presented by not just the driver, but the passenger; and his actions towards me; . . . [and the fact that] the driver had identified that the vehicle belonged to the passenger, and he was present in the vehicle." *Id*. at 45. Officer Ramos also felt that he needed to complete his review of the driver's license, registration, and insurance information.

Officer Ramos asked Mr. Pina-Aboite to step to the side of the police car and questioned him about where he was coming from and where he was going.

4

Mr. Pina-Aboite responded that he and Mr. Sepulveda were coming "[f]rom Sinaloa, [Mexico,] . . . when we went we left the car in Phoenix, Arizona, and now we are going to Nebraska." Aplt's App. at 183 (Tr. of Videotaped Traffic Stop). Officer Ramos then asked how long they had been in Phoenix, and Mr. Pina-Aboite responded, "No, I was not in Phoenix." *Id*. Officer Ramos testified that he found these statements to be contradictory. Officer Ramos next asked what the defendants were doing in Mexico and how long they were there. Mr. Pina-Aboite replied that they were visiting for Mother's Day and that they had been there for two months. Officer Ramos asked to whom the car belonged, and Mr. Pina-Aboite again told him that it belonged to his brother, Mr. Sepulveda.

Officer Ramos then told Mr. Pina-Aboite to wait by the police car while he checked the VIN on the car against the registration papers. He approached the Nissan and viewed the VIN on the dashboard through the windshield. He found the numbers matched and found no evidence that the VIN plate had been altered. He then opened the driver's side door to view the VIN plate on the inside of the door. Mr. Sepulveda was still sitting in the front passenger seat. Officer Ramos told him why he had stopped the car and that he was checking the VIN. Officer Ramos then asked Mr. Sepulveda about where he had been, and Mr. Sepulveda replied that they had been in Mexico on an emergency because his mother had been ill. Officer Ramos testified that in part of the conversation not recorded on

5

his microphone, Mr. Sepulveda said they had been in Mexico for ten days, and that they had dropped the car off in Phoenix and taken a bus to Sinaloa.

Officer Ramos returned to Mr. Pina-Aboite and asked him again about the length and reason for the trip to Mexico. Mr. Pina-Aboite reaffirmed his story that they had been there for two months for Mother's Day. Officer Ramos testified that at this point his suspicions were heightened by the discrepancies in the two defendants' stories about their travels. He also found suspicious the claim that the two were brothers, because he could find no common last name in their identification documents.

Nevertheless, Officer Ramos returned all of the identification documents to Mr. Pina-Aboite and thanked him. As Mr. Pina-Aboite started back toward the Nissan, Officer Ramos called after him in Spanish, "¿Sabes que?" or "You know what?" and then said "Um, this car?" Aplt's App. at 186. Mr. Pina-Aboite turned and walked back to Officer Ramos, asking whether he needed to change his license plate. Officer Ramos replied that he did not, then asked him several questions about where and how they had crossed the border. The officer asked whether they were carrying much money, or any drugs or weapons, and Mr. Pina-Aboite answered no each time. Officer Ramos then asked, "[M]ay I search?" and Mr. Pina-Aboite agreed. *Id*. at 187. Mr. Pina-Aboite gave consent to search approximately two minutes after Officer Ramos returned the documents to him.

Officer Ramos did not inform Mr. Pina-Aboite that he had the right to refuse consent.

Around the time Mr. Pina-Aboite agreed orally to the search, another officer arrived with a drug-sniffing dog. Officer Ramos approached Mr. Sepulveda and again asked him about the reason for their trip and asked him whether they were carrying various forms of contraband. Mr. Sepulveda replied no to each question; the officer then asked him for permission to search, and Mr. Sepulveda agreed. Officer Ramos did not inform Mr. Sepulveda that he had the right to refuse consent. Officer Ramos asked Mr. Sepulveda to step out of the car and to stand on a nearby grassy bank, separated from Mr. Pina-Aboite.

Officer Ramos gave each defendant a consent form, which was written in Spanish and English, and which each defendant signed. The forms advised of the right to refuse consent. Officer Ramos did not read the forms to the defendants, nor ask if they understood them.

Officer Ramos then asked each defendant if he could use the dog to search the car, telling them that the search would go faster that way, and each assented. The search of the car uncovered eleven pounds of crystal methamphetamine in the gas tank. After being advised of their *Miranda* rights, both defendants said they had put the drugs in the gas tank.

Mr. Pina-Aboite and Mr. Sepulveda were indicted for conspiracy to possess

7

and possession with intent to distribute over 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). Following a hearing on September 22, 2003, the district court granted defendants' motion to suppress evidence. On November 17, 2003, the district court granted the government's motion for reconsideration and denied defendants' motion to suppress. On March 11, 2004, the district court granted defendants' motion for reconsideration and again granted their motion to suppress. In this second order to suppress, the district court found (1) the initial stop was valid based on Officer Ramos' belief that the license plate had expired; (2) "[c]ontinued detention of the Defendants without reasonable suspicion after Officer Ramos determined the license plate was current was in violation of Defendants' Fourth Amendment protections"; and (3) "[t]he government failed to meet its burden to show that a subsequent, voluntary consent by Defendants purged the taint of such violation." Aplt's App. at 212 (Order, dated Mar. 11, 2004). The government's appeal followed.

Below we discuss the government's arguments that (A) Officer Ramos' detention of the defendants did not violate their Fourth Amendment rights because (1) Officer Ramos was justified in completing his review of the defendants' driver's licenses, registration, and insurance; and (2) Officer Ramos had developed reasonable suspicion based on the defendants' nervousness and Mr. Sepulveda's avoidance of eye contact. In the alternative, the government argues

8

that (B) even if at some point the detention became illegal, when Officer Ramos returned the identification documents to Mr. Pina-Aboite, the traffic detention ended, and the illegal detention "transformed into a consensual encounter, which was an intervening event freeing the subsequent consent to search from any illegality." Aplt's Br. at 28.

## Standard of Review

"When reviewing an order granting or denying a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous, and we view the evidence in the light most favorable to the district court's determination." *United States v. Caro*, 248 F.3d 1240, 1243 (10th Cir. 2001). "[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994). "However, the ultimate determination of reasonableness under the Fourth Amendment is a question of law which we review de novo." *Caro*, 248 F.3d at 1243.

## A. Legality of Detention

The Fourth Amendment protects individuals from "unreasonable searches

and seizures." U.S. CONST. amend. IV. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief." *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (internal quotation marks omitted). "A routine traffic stop is analogous to an investigative detention and is analyzed under the principles stated in *Terry v. Ohio*, 392 U.S. 1 (1968)." *Caro*, 248 F.3d at 1244.

"To determine the reasonableness of an investigative detention, we make a dual inquiry. First, we ask whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. (internal quotation marks omitted). "Thus, we assess the reasonableness of a traffic stop based on an observed violation by considering the scope of the officer's actions and balancing the motorist's legitimate expectation of privacy against the government's law-enforcement-related interests." *Holt*, 264 F.3d at 1220.

## 1.    Regulatory Purpose of Traffic Stops

It is undisputed that the initial stop of the defendants' car was justified by Officer Ramos' reasonable articulable suspicion that the Nissan's license plate had expired. Although this suspicion was dispelled almost immediately, the government argues that Officer Ramos' detention of the defendants was lawful without further reasonable suspicion because "[o]nce a lawful traffic stop has

10

been made, and the officer has routinely requested license, registration, and insurance information, his investigation of the occupants' identity and the vehicle's ownership serves a proper regulatory purpose that is independent of the traffic-infraction violation." Aplt's Br. at 20 (relying on *Delaware v. Prouse*, 440 U.S. 648, 658 (1979) (acknowledging the States' "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed")). The government would have us hold that so long as "there is a reasonable-suspicion justification for the detention at the time the officer begins his regulatory check of license and registration information," he is entitled to further detain a driver to complete his review of the documents – even if his reasonable suspicion is immediately dispelled. *Id*. at 21-22.

As a preliminary matter, we note that the government's argument was not adequately raised before the district court. The government concedes that it "did not initiate the argument that the continuation of the stop was justified by a regulatory purpose," but contends that it may defend the district court's ruling on the government's motion for reconsideration that Officer Ramos had not completed his review of the defendants' information at the time he determined no traffic violation had occurred. Aplt's Reply Br. at 2 n.1 (citing Aplt's App. at

11

174-76).  Because "[i]t is within our discretion to decide on a case-by-case basis which questions to address for the first time on appeal," *Thompson v. United States*, 223 F.3d 1206, 1211 (10th Cir. 2000), we will reach the issue.

During a typical traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation."  *Caro*, 248 F.3d at 1244.  Also, "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."  *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).  While an "officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning," *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997), "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

> [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Id*.  Indeed, "motorists ordinarily expect to be allowed to continue on their way once the purposes of a stop are met."  *Holt*, 264 F.3d at 1221.

The cases relied upon by the government permitting a prolonged detention for regulatory checks of identification documents and questioning about travel

12

plans are distinguishable from the instant case because they all involved traffic stops in which citations were actually warranted, such that the regulatory checks and questions were at all times supported by reasonable suspicion. *See Williams*, 271 F.3d at 1264-65 (defendant clocked exceeding the speed limit); *United States v. West*, 219 F.3d 1171, 1174 (10th Cir. 2000) (same); *Wood*, 106 F.3d at 944 (same); *United States v. Rivera*, 867 F.2d 1261, 1262 (10th Cir. 1989) (defendant observed tailgating). In this case, however, Officer Ramos' suspicion that a traffic violation had occurred was dispelled almost immediately after he stopped the defendants and he observed that the vehicle's license plate was current. Nevertheless, Officer Ramos prolonged the detention, retaining the defendants identification documents for several minutes, questioning the defendants extensively, and checking the VIN on the car two separate times.

In *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), we held that when an officer stopped the defendant for the sole purpose of ensuring the validity of the vehicle's registration sticker, and upon approaching the car observed that the sticker was valid, "the purpose of the stop was satisfied. [The officer's] further detention of the vehicle to question [defendant] about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification." *Id.* at 561. The government attempts to distinguish *McSwain* on the basis that Officer Ramos did not learn

that the registration sticker was current until *after* he had requested the defendants' identification documents.  This difference in timing is irrelevant because when Officer Ramos' suspicion regarding the validity of the license plate was dispelled, the sole purpose of the stop was met, as in *McSwain*.  He was not justified in extending the scope of the detention, and he should have returned the defendants' documents and allowed them to continue on their way.  *See McSwain*, 29 F.3d at 562 (recommending that "[a]s a matter of courtesy, the officer could explain to drivers in [such] circumstances the reason for the initial detention and then allow them to continue on their way").

In *United States v. Valadez*, 267 F.3d 395 (5th Cir. 2001), an officer stopped a car that appeared to have an expired vehicle registration sticker on the front windshield and illegal window tinting on other windows.  After making contact with the driver, the officer acknowledged that the sticker was valid but that the window tint appeared to be illegal.  Before retrieving a window-tint meter from his patrol car, the officer asked the driver for his driver's license and insurance card, both of which appeared to be valid.  When the officer returned to his patrol car to get the window-tint meter, he requested a computer check of the driver's license, and the driver's outstanding warrants and criminal history. While the computer checks were in progress, the officer returned to the vehicle, inspected the window tint, and determined that it was legal.  However, the officer

14

continued to detain and question the driver, who admitted that he was carrying weapons in his car. When further inquiry revealed that the driver had a felony record, he was charged with being a felon in possession of a weapon.

However, the Fifth Circuit held that in the absence of reasonable suspicion beyond that which led to the initial stop,

> [f]urther detention was not lawful after the point at which the purposes of the stop was resolved – that is, when Officer Slubar determined that Valadez had a proper inspection sticker and proper window tinting. There was then no further reason to detain Valadez, and all that followed thereafter contravened Valadez's Fourth Amendment rights. Therefore, because the relevant period of lawful detention at issue expired, all evidence that followed, including Valadez's responses to the questions, his guns, and his criminal record should be suppressed.

*Id*. at 398.

Similarly, we hold that once Officer Ramos became aware that there was no traffic violation, it was unreasonable and a violation of the Fourth Amendment to extend the scope of the detention for the purpose of inspecting the defendants' identification, registration, and insurance documents. Although Officer Ramos defends his prolonged detention of the defendants based on their supposedly inconsistent descriptions of their travel plans and his doubt of their claim to be brothers, these statements were made *after* Officer Ramos determined that the licence plate sticker was valid. Therefore, they were tainted by the unlawful detention and cannot contribute to the reasonable suspicion inquiry. *Id*.

We note that as part of Officer Ramos' regulatory investigation of the

15

defendants' identification documents, he checked the VIN plates on the vehicle against the car's registration two separate times, looking through the windshield to examine the dashboard plate and opening the car door to view the plate on the interior of the driver's side door panel. This procedure contravenes our holding in *Caro* that "where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention by entering a vehicle's passenger compartment for the purpose of further examining any VIN." 248 F.3d at 1246. It was during Officer Ramos' check of the interior VIN that he questioned Mr. Sepulveda about the defendants' travel plans and became suspicious based on the inconsistencies between his and Mr. Pina-Aboite's stories. Under *Caro*, Mr. Sepulveda's statements would be suppressed as the fruit of an illegal search, and so could not contribute to Officer Ramos' reasonable suspicion of illegal activity. *Id*. at 1248.

2.     **Reasonable Suspicion of Illegal Activity**

Although we have held that Officer Ramos was not justified in prolonging the defendants' detention for a regulatory purpose, it is permissible for an officer to detain a driver for further questioning beyond that related to the traffic initial stop "if he has an objectively reasonable and articulable suspicion illegal activity

has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). "Reasonable suspicion is a minimal level of objective justification which the officers can articulate, as distinct from an inchoate and unparticularized suspicion or hunch." *United States v. Valles*, 292 F.3d 678, 680 (10th Cir. 2002) (internal quotation marks omitted). Reviewing courts making reasonable-suspicion determinations "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The government argues that at the time that Officer Ramos discovered that the vehicle's registration sticker was valid, he had an objectively reasonable and articulable suspicion of illegal activity based on "the defendants' excessive nervousness" – which Officer Ramos deduced from their "shaking hands and heavy breathing"– and Mr. Sepulveda's avoidance of eye contact. Aplt's Br. at 25; *see United States v. Walker*, 933 F.2d 812, 817 n.3 (10th Cir. 1991) ("The general term 'nervousness' encompasses an almost infinite variety of behaviors. No doubt there are circumstances in which an individual's nervous behavior would give rise to a reasonable suspicion of criminal activity."); *United States v. Chavez-Valenzuela*, 268 F.3d 719, 727 n.6 (9th Cir. 2001) ("[A]voidance of eye contact is a common sign of nervousness.").

17

The district court concluded that under the circumstances the defendants' nervousness did not give rise to a reasonable articulable suspicion of illegal activity. "We must accept this determination unless it is clearly erroneous." *Walker*, 933 F.2d at 817.

"We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on the nervousness of either the driver or passenger as a basis for reasonable suspicion in all cases of this kind must be treated with caution." *Fernandez*, 18 F.3d at 879 (internal quotation marks omitted). "It is certainly not uncommon for most citizens – whether innocent or guilty – to exhibit signs of nervousness when confronted by a law enforcement officer." *Wood*, 106 F.3d at 948. Thus, "courts should discount the detaining officer's reliance on the detainee's nervousness." *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004) (internal quotation marks omitted); *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) ("[A]bsent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion.").

Using nervousness as a factor in establishing reasonable suspicion is especially "troublesome" when there is a "complete lack of evidence in the record that [the detaining officer] had any prior knowledge of [the defendants] to make

18

an evaluation of their behavior." *Fernandez*, 18 F.3d at 879 (citing *United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir.1992) ("Nothing in the record indicates whether Agent Ochoa had any prior knowledge of Defendant, so we do not understand how Agent Ochoa would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner. Rather, Defendant's appearance to Agent Ochoa is nothing more than an inchoate suspicion or hunch.") (internal quotation marks and citations omitted), *overruled in part on other grounds by United States v. Little*, 18 F.3d 1499, 1504 n.5 (10th Cir. 1994)); *Wood*, 106 F.3d at 948 (noting that the officer "had no prior acquaintance with Mr. Wood which enabled the trooper to contrast Mr. Wood's behavior during the traffic stop with his usual demeanor"). Officer Ramos' conclusion that the defendants were exhibiting nervous behavior is a "subjective evaluation" made without any prior knowledge of their usual demeanor, making it less significant in formulating a reasonable suspicion. *Bloom*, 975 F.2d at 1458.

"While nervousness may . . . appear as a factor in many traffic stop cases, we have never held that by itself it creates a reasonable suspicion of criminal activity." *Fernandez*, 18 F.3d at 880; *Salzano*, 158 F.3d at 1113 ("Nervousness alone cannot support reasonable suspicion of criminal activity."). As in *Fernandez*, there is

> an important distinction between this case and our other cases in this area. More specifically, a defining characteristic of our traffic stop

19

jurisprudence is the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen.

*Id*. at 879 (collecting cases). The defendants provided Officer Ramos with valid licenses, registration, and insurance. Officer Ramos could not "justify the continued detention . . . based on any specific, objective factors supporting a reasonable inference that the [vehicle] was stolen, that the defendant[s] [were] trafficking in drugs, or that [they] were committing any other criminal offense." *Id*. at 880.

Indeed, Officer Ramos' testimony suggests that he was acting on an inchoate and unparticularized hunch rather than a reasonable articulable suspicion. He testified that his

suspicions just rose simply because, again, of the totality of the circumstances; not one factor, not an individual factor, but all of them. . . . I believed that there was criminal activity afoot, there was something wrong; but yet, there was nothing indicating that it would be just a stolen vehicle or drugs or a warrant or something else,

Aplt's App. at 56-57; "there were a lot of things that, based on my training and experience, just wasn't [sic] right," *id.* at 46; "I didn't know what at the time; but as the time went on . . . it was obvious that something was definitely not right." *Id.* at 127. *See Fernandez*, 18 F.3d at 880 (holding that there was insufficient evidence of officer's reasonable suspicion and noting that officer's "testimony

20

regarding his 'sixth sense,' his detection of a 'tension in the air,' and his belief that something was 'afoot,' strongly suggests he was acting more on an unparticularized hunch than on reasonable and objective suspicion").

After reviewing the record, we cannot find clear error in the district court's finding that Officer Ramos' observation of the defendants' shaking hands, heavy breathing, and avoidance of eye contact were insufficient to support a reasonable suspicion of illegal activity. Officer Ramos' continued detention of the defendants in the absence of such suspicion was a violation of their Fourth Amendment rights.

## B. Effect of Consent to Search

We hold that Officer Ramos' prolonged detention of the defendants was supported neither by the regulatory purpose of checking their identification documents nor by a reasonable suspicion of illegal activity. However, "[a] search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances." *Fernandez*, 18 F.3d at 881. "When there has been such a violation, the government bears the heavy burden of showing that the primary taint of that violation was purged. To satisfy this burden, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between

21

the illegal detention and the consent." *Caro*, 248 F.3d at 1247 (internal quotation

marks and citations omitted).

Although no single factor is dispositive,

> [t]he Supreme Court has provided three factors that are especially
> relevant to determining whether a consent is tainted by a preceding
> illegal search or seizure: 1) the temporal proximity between the police
> illegality and the consent to search; 2) the presence of intervening
> circumstances; and particularly 3) the purpose and flagrancy of the
> official misconduct.

*United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (citing

*Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). Because the issue of the purging

of the taint of a Fourth Amendment violation "is fact-intensive, the district

court's findings must be upheld unless they are clearly erroneous." *United States*

*v. Eylicio-Montoya*, 70 F.3d 1158, 1165 (10th Cir. 1995).

1.     **Temporal Proximity**

As discussed above, the detention became illegal when Officer Ramos

prolonged the detention past the point at which he determined that the vehicle's

license plate was not expired. The defendants granted verbal consent to search

and signed the consent forms only a matter of minutes later. "We have repeatedly

held that consent is not voluntary when in such close temporal proximity to an

illegal [detention]." *Gregory*, 79 F.3d at 979-80 (citing *McSwain*, 29 F.3d at 563

(holding that consent was not voluntary when obtained 'only a few minutes' after

22

the illegal seizure); *Fernandez*, 18 F.3d at 883 (holding that consent was not voluntary when 'only moments' elapsed between illegal detention and seizure); and *United States v. Maez*, 872 F.2d 1444, 1455 (10th Cir. 1989) (holding that taint of illegal seizure not purged when consent form signed 45 minutes later)).

## 2.    Intervening Circumstances

The government argues that "there was a very significant 'intervening circumstance,' between the presumed illegality and the consent." Aplt's Reply Br. at 10. The government asserts that when Officer Ramos returned the identification documents to Mr. Pina-Aboite and thanked him, the illegal detention ended, and the subsequent interaction between Officer Ramos and the defendants was a consensual encounter, which attenuated the taint of the illegal detention. We disagree.

Although in evaluating whether an encounter with law enforcement became consensual, we apply an objective standard, *United States v. Manjarrez*, 348 F.3d 881, 885-86 (10th Cir. 2003) ("An encounter is consensual when a reasonable person would believe he was free to leave or disregard the officer's request for information."),

> [i]n applying the second factor in *Brown*, *we look only from the defendant's perspective* in determining whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop so as to render his subsequent consent voluntary in fact. For consent obtained subsequent to an illegal detention to be

23

voluntary in fact, there must be proof of facts or events which ensure that the consent provided by the defendant is truly voluntary and not the fruit of the illegal stop. The facts or events must create a discontinuity between the illegal stop and the consent such that the original illegality is weakened and attenuated.

*Gregory*, 79 F.3d at 980 (emphasis added).

After Officer Ramos returned the identification documents to Mr. Pina-Aboite and thanked him, he immediately called after Mr. Pina-Aboite, saying, "You know what? Um, this car?" Aplt's App. at 186. Mr. Pina-Aboite turned around and walked directly back to Officer Ramos, asking "Do I need to change the plates or what?" *Id*. Officer Ramos responded in the negative, and then proceeded to ask Mr. Pina-Aboite a series of questions about where the defendants had crossed to the border and whether they were carrying any drugs or weapons, culminating in his request to search the car.

> Although we have established a bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him, a finding that a driver's documentation was returned does not end the matter, as we have specifically indicated this is not always sufficient to demonstrate that an encounter has become consensual.

*United States v. Bustillos-Munoz*, 235 F.3d 505, 515 (10th Cir. 2000) (internal quotation marks and citations omitted). "Although not prerequisites, in determining whether consent is voluntary when given following the return of defendants' documents, we look at such factors as whether the officer informed

24

the defendant that he was free to leave the scene or that he could refuse to give consent." *Gregory*, 79 F.3d at 979. *See also Florida v. Bostick*, 501 U.S. 429, 432 (1991) (stating that informing a defendant of his right to refuse consent is a factor "particularly worth noting"); *United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (noting that verbal advisement to defendant that she could decline consent was "especially significant"). In *McSwain*, we held that "[the defendant's] consent was not sufficiently an act of free will to purge the primary taint of the illegal detention," observing that

> though [the officer's] return of [the defendant's] identification and the vehicle registration may be a factor indicating that [the defendant] was free to leave, [the officer] failed to specifically inform [the defendant] that he was free to leave the scene or that he could refuse to give his consent. These are important factors in our consideration.

29 F.3d at 563 (internal quotation marks and citations omitted).

When he returned the documents, Officer Ramos did not tell Mr. Pina-Aboite that he was free to leave, and he immediately reinitiated conversation with him about the car, the subject matter of the stop. Indeed, Mr. Pina-Aboite's quick return to Officer Ramos and his question about the license plate indicates his concern that he was still in violation of the traffic laws and that he was not under the impression that the detention had ended. The district court's finding that there was no intervening event creating a discontinuity between the illegal detention and his eventual consent was not clearly erroneous.

25

### 3. Purpose and Flagrancy of Official Misconduct

Finally, we examine the third *Brown* factor, the purpose and flagrancy of the official misconduct. Although Officer Ramos was justified in initially stopping the defendants based on his belief that the license plate was expired, his conduct following his discovery that there was no traffic violation was not justified, namely (a) his continued detention of the defendants in the absence of a reasonable suspicion of illegal activity; (b) his checking of the dashboard VIN in the absence of reasonable suspicion that the car was unregistered; (c) his unauthorized second check of the VIN on the door panel, problematic under *Caro*, and his concurrent questioning of Mr. Sepulveda; (d) his failure to advise Mr. Pina-Aboite that he was free to go upon return of his documents; (e) his calling Mr. Pina-Aboite back after returning his documents because he "wanted to see if [Mr. Pina-Aboite] would be able to provide information to sustain or dispel [his] suspicions," Aplt's App. at 90; and (f) his repetitive questioning about travel plans and whether the defendants were carrying various kinds of contraband. Officer Ramos' behavior suggests that he detained the defendants "with a quality of purposefulness, embarking on a fishing expedition in the hope that something might turn up." *McSwain*, 29 F.3d at 563 (internal quotation marks and citations omitted); *Caro*, 248 F.3d at 1248.

Under the totality of the circumstances, and with special emphasis on the

three *Brown* factors, we conclude that there was not "a sufficient attenuation or break in the causal connection between the illegal detention and the consent." *Caro*, 248 F.3d at 1247 (internal quotation marks omitted). Thus, we agree with the district court that the government failed to meet its heavy burden of proving that the defendants' consent to search the car was untainted by the Fourth Amendment violation.

## CONCLUSION

Although Officer Ramos' initial traffic stop of the defendants was justified, he unlawfully detained them beyond the purposes of the stop. The defendants' subsequent consent to the search of the car was not sufficient to purge the taint of the illegal detention. Accordingly, we AFFIRM the district court's grant of the defendants' motion to suppress.

Entered for the Court,

Robert H. Henry
Circuit Judge