Ali PLEASANT–BEY, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–706.

District of Columbia Court of Appeals.

Argued Nov. 13, 2009.
Decided Feb. 4, 2010.

Jonathan W. Anderson, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

John P. Mannarino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Florence Pan, John G. Giovannelli, and

Laura R. Bach, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and OBERLY, Associate Judges, and FARRELL, Senior Judge.

OBERLY, Associate Judge:

Ali Pleasant–Bey was convicted of armed robbery, D.C.Code §§ 22–2801,–4502 (2001), first-degree felony murder while armed, predicated upon armed robbery, D.C.Code §§ 22–2101, –4502, and related weapons offenses [1] for his role in the killing of Frank Sinclair. We affirm the judgment of conviction for felony murder and the weapons offenses, but remand the case for the limited purpose of vacating the armed robbery conviction, which merges with the felony murder conviction.

## I. Facts.

The jury could have found the following facts. On the afternoon of June 19, 2003, Pleasant–Bey (who drove an early '80s Volkswagen that smelled like gas when it started) told his friend Aaron Williams: "I am going to get [Frank Sinclair's Cadillac]." At around seven or eight p.m. that evening, Pleasant–Bey pulled up to Williams' house in the Cadillac; Pleasant–Bey (who had a valid D.C. license) was driving, and Sinclair (who had been stopped a month earlier in the District for driving with expired D.C. temporary tags and simultaneously arrested for driving with a suspended New York license and no D.C. driver's permit) was in the passenger's seat. The three then drove to the home of one of Pleasant–Bey's prostitutes. Pleasant–Bey stepped out of the car for three minutes, during which time Sinclair and Williams sat in the Cadillac without uttering a word to one another.

Sensing danger, Sinclair told Pleasant–Bey when the latter returned from the prostitute's house that he did not want Williams sitting behind him. Pleasant–Bey tried to assure Sinclair that Williams was "all right," but Williams moved to the center of the backseat anyway to honor Sinclair's wishes. Soon thereafter, Pleasant–Bey snuck a pistol to Williams through a gap between the left side of the driver's seat and the driver's door. Williams took the gun, pressed it against the back left side of Sinclair's neck, and fired, killing Sinclair. Pleasant–Bey then opened the passenger-side door and pushed and kicked Sinclair out of the car.

The killing done, Pleasant–Bey took the gun back from Williams and drove to the home of Pleasant–Bey's "play uncle," Michael Square. On the way, Pleasant–Bey called Square, saying that "he needed a bucket of water, a brush, and some bleach or some peroxide." Square obliged, and Pleasant–Bey cleaned the car for thirty minutes. Neither Williams nor Square helped Pleasant–Bey during this time. After Pleasant–Bey finished cleaning the car, he drove off with Williams in the passenger seat.

Pleasant–Bey was fortuitously picked up in Sinclair's Cadillac less than two weeks after Sinclair's murder. The arrest occurred as follows. MPD Officer Hall was driving on patrol on 9th Street, Northwest, in the vicinity of 9th and O Streets, when he saw a black Cadillac heading toward him on O Street. Hall noticed that the car had a "D.C. temporary tag with the 54th series." Although the Deputy Director of the District of Columbia Department of Motor Vehicles testified that as of April 2003, the "DG–54" series of temporary li-

---

1. D.C.Code § 22–4502(a) (2001) (carrying a pistol without a license); D.C.Code § 7–2502.01 (2001) (possession of an unregistered firearm); and D.C.Code § 7–2506.01(3) (2001) (unlawful possession of ammunition).

cense plates was not expired or recalled, Hall previously had "encountered several tags that were expired in that type of series," and decided to investigate further. After seeing the tags, Hall made a U-turn, at which point the Cadillac "proceeded to accelerate." Hall then saw the Cadillac make a "quick right turn onto 9th Street and then make a second quick right turn into [a] Giant Food parking lot." According to Hall, the Cadillac was driving at an "unreasonable amount of speed" through the parking lot, even though the lot was "fairly full of pedestrians."

After Hall "proceeded through the parking lot to follow" the Cadillac, he noticed that it was "backing into a parking space." Hall "thought at first that [the Cadillac] might be trying to flee" Hall because of the expired tags. Accordingly, Hall waited for the Cadillac to come to a complete stop because he "didn't want to cause anybody else any danger." At that point, Hall pulled in front of the Cadillac so as to block it in the parking space and activated his emergency lights.

After Hall had blocked the Cadillac, Pleasant–Bey and Aaron Williams stepped out of the car; Pleasant–Bey had been driving, and Williams was in the passenger seat. Hall asked the men to get back into the car, and the two complied. Hall then asked Pleasant–Bey for his license and registration, which Pleasant–Bey provided without incident. Although the registration matched the license plates, Hall noticed that the license plates had been altered—the "expiration date had been peeled away and restamped along with other identifications of the vehicle."

Hall then ran Pleasant–Bey's driver's license, which came back valid. Hall also remembered, however, that during roll call he received a flyer "in reference to a vehicle that was wanted in question to a homicide." In fact, when Hall checked, he saw that the Cadillac's registration matched the description and the Vehicle Identification Number on the flyer. Hall called for backup, and when backup arrived, the police placed Williams and Pleasant–Bey in separate police cars. Hall noticed from outside of the car the grip of a handgun and a magazine of a firearm protruding from underneath Williams' seat. Pleasant–Bey was then arrested for possession of the firearm and for driving an unregistered automobile.

## II. Analysis.

### A. Pleasant–Bey's Challenge To The *Terry* Stop.

■ Pleasant–Bey's first argument on appeal is that the trial court erred in denying his motion to suppress evidence gathered at the traffic stop as a result of which he was arrested. We hold that the trial court correctly denied Pleasant–Bey's motion.

■ "The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Herring v. United States*, —— U.S. ——, ——, 129 S.Ct. 695, 699, 172 L.Ed.2d 496 (2009) (quotation marks omitted). It is settled that the "protections [of the Fourth Amendment] extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also Brendlin v. California*, 551 U.S. 249, 255, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). In these so-called *Terry* stops, the "balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause." *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744 (quotation marks and citation omit-

ted). Accordingly, "in such cases, the Fourth Amendment is satisfied by reasonable suspicion to believe that criminal activity may be afoot." *Id.* (quotation marks omitted). To justify a *Terry* stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274, 122 S.Ct. 744; *see also Umanzor v. United States,* 803 A.2d 983, 992 (D.C.2002).

■ The Supreme Court has "repeatedly" taught that when making "reasonable-suspicion determinations," reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744 (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). *Terry,* in other words, "precludes [a] divide-and-conquer analysis," *Arvizu,* 534 U.S. at 274, 122 S.Ct. 744, because " 'the whole may sometimes be more than the sum of its parts.' " *Umanzor,* 803 A.2d at 993 (quoting *Mayes v. United States,* 653 A.2d 856, 864 (D.C. 1995)). An officer's "inchoate and unparticularized suspicion or hunch of criminal activity" is insufficient to justify a stop. *Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quotation marks omitted); *accord Arvizu,* 534 U.S. at 274, 122 S.Ct. 744; *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. That said, police "officers [can] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744 (quoting *Cortez,* 449 U.S. at 418, 101 S.Ct. 690); *see also Ornelas v. United States,* 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("a police officer may draw inferences based on his own experience in deciding whether probable cause exists"). Further, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Arvizu,* 534 U.S. at 277, 122 S.Ct. 744.

In the end, the "touchstone of the Fourth Amendment is 'reasonableness.' " *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), and "an assessment of reasonableness should be informed by '(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise.' " *Umanzor,* 803 A.2d at 992 (quoting *United States v. Mendenhall,* 446 U.S. 544, 561, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Powell, J., concurring)).

■ In reviewing the denial of a motion to suppress physical evidence, "we defer to the trial court's factual findings unless clearly erroneous, and make an independent legal assessment as to whether there was reasonable suspicion for the stop." *Umanzor,* 803 A.2d at 991; *accord Green v. United States,* 974 A.2d 248, 255 (D.C. 2009).

Reviewed under these standards, this is a straightforward case: the trial court correctly held that Officer Hall had objective justification to initiate the stop that led to Pleasant–Bey's arrest. The Cadillac initially caught Hall's attention because it had "54 series" tags—tags that Hall on several previous occasions knew to have been expired—and this alone arguably gave Hall justification to investigate further. *See United States v. Pina–Aboite,* 109 Fed. Appx. 227, 229, 231 (10th Cir.2004) (officer had reasonable articulable suspicion to pull over car where police officer believed that

car's license plate may have been expired based on number of license plate, even though license plate in fact was not expired); *see also United States v. Jennings*, 280 Fed.Appx. 836, 840 (11th Cir.2008) ("decision to stop [vehicle] was reasonable" where officer "believed that the out-of-state temporary tag was expired and potentially had been altered").

Hall's observations after he first noticed the Cadillac gave him additional justification to make the stop. First, the trial court credited Hall's testimony that the Cadillac accelerated after Hall made a U-turn to follow it. Hall's objectively reasonable belief that the Cadillac "may" have been attempting to flee him because he had noticed the expired tags gave him reason to suspect that criminal activity may have been afoot. *See Wilson v. United States*, 802 A.2d 367, 370 (D.C.2002) (" 'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion' ") (quoting *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673). Second, after seeing the Cadillac arguably attempting to evade him, Hall observed it driving at an "unreasonable" speed through a parking lot "fairly full" of pedestrians. On these facts, Hall's decision to initiate "the limited intrusion of a stop long enough to resolve the ambiguity" in Pleasant–Bey's actions was eminently reasonable. *Wilson*, 802 A.2d at 370 (quotation marks omitted).

Pleasant–Bey's arguments to the contrary rely on a hypertechnical view of the Fourth Amendment that finds no support in the law. Pleasant–Bey argues, for instance, that Hall unreasonably suspected that the Cadillac had expired tags because an official from the DMV testified that the 54–series tags were not recalled or expired as a general matter. But to make a *Terry* stop, the police do not have to prove by a preponderance of the evidence that a defendant has committed or is about to commit a crime. *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744. In this case, it is undisputed that Hall previously had stopped cars that had expired 54–series tags that were expired. That not all 54–series tags were expired made Hall's suspicion of criminal activity no less reasonable than the officer's suspicion in *Terry* itself, where the suspects were merely pacing in front of and looking into a store—an activity that, as a general matter, is non-culpable. *Terry*, 392 U.S. at 6, 88 S.Ct. 1868. Further, the fact that Hall's premise may have been not entirely accurate does not necessarily make his decision to investigate unreasonable. *See, e.g., Duckett v. United States*, 886 A.2d 548, 552 (D.C.2005).[2] At any rate, even if it was unreasonable for Officer Hall to suspect that the Cadillac had expired tags, that would not alter the result because Pleasant–Bey's speeding away from Hall and Pleasant–Bey's driving at an unreasonable rate of speed through the parking lot gave Hall ample reason to initiate a *Terry* stop.[3]

---

**2.** The outcome in *Duckett v. United States*, 886 A.2d 548 (D.C.2005), is not to the contrary. In that case, the court held that a police officer lacked reasonable suspicion to initiate a traffic stop when the officer pulled the defendant over even though the officer had "no reason to focus" at the outset on the defendant's car. *Id.* at 549. In this case, by contrast, Officer Hall had a reason to focus at the outset on Pleasant–Bey's car; it simply turned out that the facts underlying Hall's decision were not entirely accurate.

**3.** The cases that Pleasant–Bey cited in a Rule 28(k) letter filed on November 19, 2009, six days after oral argument, are inapposite. As an initial matter, we note that two of the cases in the letter—*Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)—not only were decided decades before oral argument, but also were mentioned in Pleasant–Bey's opening brief. If Pleasant–Bey's counsel thought that those cases had special bear-

Pleasant–Bey also argues—for the first time on appeal—that "[t]ravelling at an 'unreasonable speed' in the parking lot of a privately owned store does not violate any law of the District of Columbia." According to Pleasant–Bey, the District's "speed restrictions" apply only to "publicly maintained ways," not to "private grocery store parking lots," such as the lot in front of the Giant store where Pleasant–Bey was arrested. And if speeding in front of the Giant store is not a crime, the argument goes, then Officer Hall's suspicion that criminal activity was afoot was unreasonable and the seizure was invalid. We are not persuaded.

For one thing, Pleasant–Bey's able trial counsel did not argue that the stop was unreasonable because it took place in the Giant parking lot, so this claim arguably should be reviewed for plain error alone. In any event, we conclude that the seizure was reasonable even if the District's traffic laws say nothing about treating the parking lot of a supermarket as though it were an Interstate highway. The government argues that under the "community caretaking" doctrine that the Supreme Court articulated in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), Hall acted reasonably in response to Pleasant–Bey's driving in the parking lot.[4] It is not clear to us that *Dombrowski* applies in this context. That case involved a warrantless search of a car following an accident, not a *Terry* seizure, *id.* at 434–38, 93 S.Ct. 2523, and besides, "[w]hat community caretaking involves and what boundaries upon it exist have simply not been explained to an extent" that would permit us to comfortably apply that doctrine in this case. *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir.2009).

Yet the government's basic point is undeniable. Officer Hall saw Pleasant–Bey driving in a parking lot "fairly full" of pedestrians at an "unreasonable" speed. The notion that the Fourth Amendment required Hall in these circumstances to "shrug his shoulders," *Umanzor*, 803 A.2d at 995 (quotation marks omitted), is fanciful at best. "The role of a peace officer

---

ing on this case, he should have emphasized them at oral argument, not cited them in a post-argument 28(k) letter. *See* D.C.App. R. 28(k) (permitting citation to "pertinent and significant authorities [that] come to a party's attention *after* the party's brief has been filed, or *after* oral argument but before decision") (emphasis added). The third case, *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), likewise is a poor candidate for a 28(k) letter because it was decided nearly 25 years before we heard oral argument in Pleasant–Bey's appeal. *See PFS Distrib. Co. v. Raduechel*, 574 F.3d 580, 588 n. 2 (8th Cir.2009) (under parallel Federal Rule of Appellate Procedure, it is "prefer[able] that authorities cited in a [supplemental] letter consist of intervening decisions or new developments") (quotation marks omitted). At any rate, none of the cases that Pleasant–Bey cites in the November 19 letter supports his position. *Prouse* is easily distinguishable because there, unlike in this case, the police officer pulled a vehicle over randomly to conduct a spot check; the officer suspected nothing wrong prior to making the stop. *Prouse*, 440 U.S. at 650–51, 99 S.Ct. 1391. *Johnson* is a pre-*Terry* decision that addresses the legality of a warrantless search of a hotel room. The Court's unanimous decision in *Hensley* affirming the legality of a seizure and holding that a *Terry*-level stop may be reasonable in order to investigate past crimes plainly does not help Pleasant–Bey either.

4. In his reply brief, Pleasant–Bey makes the remarkable assertion that the government is precluded from relying on the community caretaker doctrine because the government did not rely on that doctrine in the trial court. What Pleasant–Bey ignores is the fact that the government only raised the community caretaker argument to respond to Pleasant–Bey's claim made for the first time on appeal that the District's traffic laws do not apply in putatively "private" parking lots. If Pleasant–Bey can raise new arguments on appeal, the government must be able to respond.

includes preventing violence and restoring order, not simply rendering first aid to casualties." *See Stuart,* 547 U.S. at 406, 126 S.Ct. 1943 (upholding a warrantless entry into a home, an intrusion of far greater constitutional magnitude than a *Terry* stop, where officers responded to report of disturbance in a home). Pleasant–Bey cites no case holding a *Terry* stop invalid on facts comparable to those presented in this case, or suggesting that a *Terry* stop is reasonable only if the officer at the time of the seizure can identify with precision the title and section of the criminal code that the suspect is violating or threatens to violate. Pleasant–Bey's failure to cite such a case is unsurprising, for "*Terry* accepts the risk that officers may stop innocent people." *Wardlow,* 528 U.S. at 126, 120 S.Ct. 673.

We also find meritless Pleasant–Bey's claim that Hall's testimony about the Cadillac's speeding through the parking lot was too "conclusory" to permit a *Terry* stop. To be sure, in order "to make an independent assessment of the sufficiency of the basis for [a] stop ... [a] judge must be apprised of sufficient facts to enable him or her to evaluate the nature and reliability of that information." *Milline v. United States,* 856 A.2d 616, 619 (D.C. 2004) (quotation marks omitted). This standard, however, was easily satisfied in this case. Officer Hall personally observed the actions that led to the *Terry* stop, which is enough to distinguish this case from *Milline* and *Ellis v. United States,* 941 A.2d 1042 (D.C.2008), the cases

that Pleasant–Bey says command a different result here.[5] Pleasant–Bey complains that the government "presented no evidence regarding the approximate speed of the car, whether other cars or pedestrians were in or near the path of the Cadillac, or special conditions or hazards in the parking lot." That argument reflects a misunderstanding of the government's burden under *Terry;* the Fourth Amendment permits a police officer to conduct a *Terry* stop even if he cannot prove that the suspected crime has actually occurred, and a police officer may effect a limited seizure even if the harm threatened by a suspect has not taken place.

In short, even taking the 54–series tags out of the equation, the stop here was a classic valid *Terry* seizure, and our decision follows *a fortiori* from *Terry* itself. In *Terry,* the officer who seized the suspects had not seen the suspects engage in any unlawful activity; all that the officer saw was "measured pacing, peering and conferring" on the part of the suspects— acts that on their face are susceptible of an innocent explanation, but that the officer, using his experience, found suspicious in context. *Terry,* 392 U.S. at 6, 88 S.Ct. 1868; *see also id.* at 22–23, 88 S.Ct. 1868. In this case, Officer Hall saw a Cadillac driving at an "unreasonable" speed in a parking lot "fairly full" of pedestrians, an act that would raise the suspicion not only of a trained officer, but of anyone observing the situation. If the seizure in *Terry* was permissible, the seizure in this case was constitutional as well.

---

**5.** *See Milline,* 856 A.2d at 619 (affirming denial of motion to suppress, but stating that "without more, conclusory testimony by police officers that a defendant matched an unknown description of the suspect is not a sufficient basis for a judge to determine that a stop was justified"; arresting officer in that case received the suspect's description from a different officer); *Ellis,* 941 A.2d at 1044–45,

1047 (accepting government's concession that stop violated Fourth Amendment where "sole witness" at suppression hearing gave testimony that "[f]or the most part ... was not based on personal knowledge," and where testifying officer "was not present when Ellis was taken into custody, nor did he observe the undercover sale").

### B. Pleasant–Bey's Claim That There Was No Robbery.

■ To prove robbery, the government had to establish: (1) a felonious taking; (2) accompanied by a carrying away; (3) of personal property of value; (4) from the person of another or in his presence; (5) against his will; (6) by violence or by putting him in fear; (7) with the intention to steal. *Lattimore v. United States*, 684 A.2d 357, 359 (D.C.1996). According to Pleasant–Bey, the government in this case failed at the first step. Pleasant–Bey reasons that "[b]ecause Sinclair had willfully given possession to Mr. Pleasant–Bey prior to the murder, there was no taking, and therefore there was insufficient evidence of larceny and robbery."

Pleasant–Bey's argument is embarrassed by our recent decision in *Jacobs v. United States*, 861 A.2d 15 (D.C.2004) (per curiam), a case that the trial court cited, yet one which Pleasant–Bey curiously all but ignores in his opening brief. In *Jacobs*, the victim wanted to sell Jacobs a rifle. *Id.* at 17. Jacobs "picked up the rifle," and was examining it, but, as the seller "approached and began to explain to [Jacobs] how the rifle worked," Jacobs turned the rifle upon the seller, took him outside, shot him, and kept the rifle. *Id.* at 17–18. Jacobs argued on appeal that the trial court erred by instructing the jury that it could convict him of robbery if the government proved that he "took *or kept* [the rifle] by using force or violence." *Id.* at 19. Jacobs reasoned that because the seller "impliedly consented to [Jacobs'] custody of the gun as he inspected it," and because the seller made no "effort or expressed any desire to recover possession of the rifle," the government· failed to prove the taking element of armed robbery. *Id.*

This court rejected Jacobs' argument, reasoning: "In these circumstances, where the threatened violence occurred directly on the heels of a plainly conditional transfer of possession (conditioned on return or purchase of the gun), it was perfectly logical for the court to instruct the jury that the threatened use of force by appellant did not have to coincide with the initial transfer so long as he used force to prevent [the seller] from regaining possession of the rifle." *Jacobs*, 861 A.2d at 20. The court ultimately held that "force used by the defendant to obtain complete possession or control of the property satisfies the requirement for taking by force." *Id.*

There is no meaningful distinction between *Jacobs* and this case. Pleasant–Bey did not have "complete and exclusive control," *Jacobs*, 861 A.2d at 21, of the Cadillac until Williams killed Sinclair. Pleasant–Bey argues that this case is distinguishable from *Jacobs* because he had possession and control of Sinclair's Cadillac when Williams shot Sinclair. But the same could be said of Jacobs and the rifle: when Jacobs shot the seller, Jacobs, not the seller, had possession and control of the gun. Indeed, Jacobs' possession and control over the rifle that he took from his victim was greater than Pleasant–Bey's possession and control over Sinclair's Cadillac as evidenced by the fact that moments before he died, Sinclair instructed Williams to move in the backseat. If Jacobs' theft is a "taking" for the purposes of the robbery statute, then Pleasant–Bey's action constituted a "taking" of Sinclair's Cadillac as well.

### III. Conclusion.

■ The judgment of conviction for felony murder and the weapons offenses [6] is

---

6. In his opening brief, Pleasant–Bey argued for the first time on appeal that the convictions for his weapons offenses, *see supra*, note

1, were invalid because they were secured under statutes that were "facially invalid and unenforceable" under the Second Amend-

affirmed. The felony murder conviction, however, merges with the armed robbery conviction, *see Jones v. United States,* 828 A.2d 169, 181 (D.C.2003), and we remand the case to the trial court for the limited purpose of vacating the armed robbery conviction.

*So ordered.*

ment. After the government pointed out that this court has rejected identical arguments made for the first time on appeal, *see Sims v. United States,* 963 A.2d 147 (D.C.2008); *Howerton v. United States,* 964 A.2d 1282 (D.C. 2009); *see also Brown v. United States,* 979 A.2d 630 (D.C.2009) (rejecting similar argument that had been preserved for review); *Plummer v. United States,* 983 A.2d 323 (D.C. 2009) (holding that CPWL and UF statutes are not facially invalid), Pleasant–Bey abandoned his Second Amendment argument in his reply brief. In light of our case law rejecting Pleasant–Bey's facial invalidity argument on both plain-error and preserved-error review, we affirm Pleasant–Bey's convictions of the weapons offenses.