*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-FS-1042

IN RE E.A., APPELLANT,

Appeal from the Superior Court
of the District of Columbia
(2023-DEL-000214)

(Hon. James A. Crowell, IV, Trial Judge)

(Argued May 21, 2025                    Decided September 4, 2025)

*Areeba Jibril*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Llewellyn X. Richie* argued the case for appellee. *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Carl J. Schifferle*, Deputy Solicitor General, and *Lucy E. Pittman*, Senior Assistant Attorney General, were on the brief for appellee.

Before BECKWITH and DEAHL, *Associate Judges*, and THOMPSON, *Senior Judge*.

DEAHL, *Associate Judge*: Police radio dispatches alerted officers to a group of people driving a stolen car and committing an ongoing series of robberies or attempted robberies. Officers in a helicopter spotted the car—it was driving erratically into oncoming traffic and eventually crashed. E.A., who was a passenger in the car, fled from the crash and was stopped by officers a minute or so afterward.

Police frisked E.A. and found a handgun in his front sweatshirt pocket. He was later adjudicated delinquent of two firearms-related offenses.

E.A. appeals those adjudications, arguing that the trial court should have granted his motion to suppress the handgun because it was the fruit of a search that violated his Fourth Amendment rights. We disagree and affirm.

## I. Factual and Procedural Background

The following facts are undisputed for purposes of this appeal. One afternoon, officers with the Metropolitan Police Department received reports via radio about a string of robberies or attempted robberies. One officer on the ground spoke with a complaining witness and radioed about a "possible . . . attempted robbery" occurring at 4:54 p.m. at 800 Hamilton Street NW, adding that "the vehicle lookout is probably going to be that same white Nissan Rogue that[ was] carjacked a couple of days ago." The officer followed up, saying there was "one incident where one witness saw two males" and a "second incident where we got the complainant right now" that involved "two females." When asked over the radio whether these were armed robberies, the officer said, "right now no weapons," and that one incident involved "an attempt to take a cellphone." The license plate number for the Nissan Rogue was also read over the radio, which matched the plate number of the Nissan Rogue that "was taken in another offense." Another officer then chimed in to say he had a

lookout for one of the 800 Hamilton suspects, describing her as a "Black female" with "dark skin," standing at 5' 2" and "wearing a red hoodie, a black bonnet, and black pants."

A new report was then radioed that someone else "was almost robbed" near the block of 1367 Hamilton Street NW, about five blocks from the incident on the 800 block of that same street. That incident apparently occurred at 4:50 p.m., four minutes before the 800 Hamilton attempted robbery, and also involved "two males [and] two females" who had been driving a "white Nissan Rogue." An officer further reported that a victim he had spoken with confirmed the license plate number of the Nissan Rogue that was recited earlier on the radio.[1]

At 5:19 p.m., a helicopter launched by the MPD spotted the Nissan Rogue, and officers in police cruisers began to converge toward it. A dispatch from an officer in the helicopter indicated that the car was traveling "extremely fast," driving in the wrong lane to pass traffic, and running through "stop signs and stoplights." That same officer then saw the car collide with another vehicle at the intersection of Kansas Avenue and Madison Street, and observed four people "bail out" and "flee

---

[1] There was also some evidence of a noontime robbery involving "three Black males [and] three Black females" at the corner of 7th and Peabody NW, which the trial court referred to as "[t]he first robbery" in its factual findings. But there is no mention in the record of a connection between the white Nissan Rogue and that incident.

the area of the crash." He described how the car's driver fled north while three others, including someone in a "green jacket," fled east.

At 5:22 p.m., an officer on the ground cornered the trio who ran east in an alley just two blocks from the crash site. That officer and Officer Noah Duckett, who arrived seconds later, drew their weapons and yelled at the three individuals to get on the ground and show their hands. Officer Duckett's body worn camera shows three individuals—a young male in a green jacket, and two young females—immediately lying face-down on the ground. One of the females is Black and dressed in a red hoodie, a black bonnet, and black pants, precisely matching the description of one of the 800 Hamilton suspects.

Officer Duckett handcuffed the person in the green jacket, who was later identified as E.A., and rolled him on his side. As Duckett flipped E.A. on his side and partially lifted him off the ground, Duckett patted E.A.'s front pant pocket and grabbed the outside of his front sweatshirt pocket. Duckett then felt around the sides of the sweatshirt pocket, and the body worn camera footage shows a handgun poke out from the other side of that pocket. Duckett testified at the suppression hearing that "a firearm came out right as we rolled [E.A.] over," and that he "[h]eard it hit the ground" and "[i]mmediately knew it was a pistol." Another officer then confiscated the gun and E.A. was arrested.

E.A. moved to suppress the gun on the grounds that (1) officers did not have reasonable articulable suspicion to stop and frisk him; and (2) in any event, their actions exceeded the scope of a *Terry* stop, so that the officers in fact arrested him and did so without the requisite probable cause.

The trial court denied the motion. It reasoned that a "collection of factors known to the police officers indicate that [E.A.] was part of a group" of four people suspected in a series of recently committed robberies, attempted robberies, and traffic violations that were committed while driving a vehicle that had been reported stolen. According to the court, those circumstances—in combination with E.A.'s flight from the vehicle after it crashed—gave the officers reasonable articulable suspicion that E.A. was involved in a common enterprise of criminal activity with the Nissan Rogue passengers, authorizing police to conduct a temporary stop and protective patdown that uncovered E.A.'s handgun. The trial court's ruling was somewhat unclear about whether officers exceeded the scope of a *Terry* stop prior to recovering a gun. But the court more clearly ruled that, in any event, officers had probable cause to arrest E.A. for "the litany of other crimes that allegedly had occurred at that point," and to search him incident to his arrest. Under that reasoning, it did not matter if officers exceeded the permissible bounds of a *Terry* stop and frisk.

E.A. was adjudicated delinquent of carrying a pistol without a license and possession of an unregistered firearm. He now appeals, challenging only the trial court's denial of his suppression motion.

## II. Analysis

In reviewing a suppression motion, "we accept the trial court's findings of fact unless they are clearly erroneous." *Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019). But "whether the police violated a defendant's rights under the Fourth Amendment is a legal question that we review de novo." *Bingman v. United States*, 267 A.3d 1084, 1087 (D.C. 2022).

On appeal, E.A. argues that (1) the information known to police officers—which he says originated in large part from "vague" and "conclusory" radio dispatches—was insufficient to establish reasonable articulable suspicion that he was involved in criminal activity or that he was armed and dangerous; and (2) even if the officers had reasonable articulable suspicion to stop and frisk him, the officers' actions exceeded the proper bounds of a *Terry* stop and amounted to an arrest, and they lacked the requisite probable cause to support an arrest. We address these arguments in turn.

*A. Police had reasonable articulable suspicion to stop and frisk E.A.*

Under the Fourth Amendment, a police officer may briefly stop a person "for investigatory purposes" in what is known as a *Terry* stop if the officer has "reasonable suspicion supported by specific and articulable facts" that the person is involved in criminal activity. *Brown v. United States*, 313 A.3d 555, 560-61 (D.C. 2024) (quoting *Funderburk v. United States*, 260 A.3d 652, 656 (D.C. 2021)); *Terry v. Ohio*, 392 U.S. 1 (1968). The officer may also conduct a "protective frisk for weapons" during the stop if they have reasonable articulable suspicion that the person is "armed and dangerous." *Brown*, 313 A.3d at 561 (quoting *Funderburk*, 260 A.3d at 656).

"To determine if a *Terry* stop was supported by reasonable articulable suspicion, a court must examine whether the totality of 'the facts available to the officer at the moment of the seizure warrant a person of reasonable caution in the belief that the stop was appropriate.'" *Mayo v. United States*, 315 A.3d 606, 620 (D.C. 2024) (en banc) (quoting *Terry*, 392 U.S. at 21-22). The reasonable articulable suspicion standard "is not toothless" in that an "'unparticularized suspicion or hunch of criminal activity' will not suffice." *Id.* (first quoting *Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013); and then quoting *Pleasant-Bey v. United States*, 988 A.2d 496, 500 (D.C. 2010)). But the standard "is not onerous" either, requiring

"considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (first quoting *Robinson*, 76 A.3d at 336; and then quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)). Reasonable articulable suspicion may be established based on the "collective knowledge" of the police at the time of the stop. *McFerguson v. United States*, 770 A.2d 66, 72-73 (D.C. 2001) (aggregating the information known by three investigating officers in the analysis).

There are nonetheless guardrails on the constellation of facts that may contribute to a reasonable articulable suspicion finding. Most notable for purposes of this appeal, the information conveyed over a radio dispatch "can contribute to the articulable suspicion calculus only if the judge has been apprised of sufficient facts to enable [them] to evaluate the nature and reliability of that information." *In re R.W.*, 334 A.3d 593, 600 (D.C. 2025) (quoting *In re T.L.L.*, 729 A.2d 334, 341 (D.C. 1999)). In other words, the government has a threshold evidentiary burden to meet before it can rely on such a dispatch to defend a stop, which ensures among other things that officers may not "bring about a lawful stop by the simple expedient of passing information on to another officer." *Id.* (quoting *Jenkins v. United States*, 152 A.3d 585, 590 (D.C. 2017)); *see also United States v. Hensley*, 469 U.S. 221, 233 (1985) (holding that where officers rely solely on another jurisdiction's "wanted flyer" to make a stop, "the evidence uncovered in the course of the stop is admissible

if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop").

Here, E.A. argues that the government did not present "*any* evidence" establishing the basis and reliability of the radio reports, meaning that the trial court should have excised those reports from its Fourth Amendment calculus. With the universe of facts properly cabined, E.A. contends, the trial court should have found that officers lacked reasonable articulable suspicion that he was involved in criminal activity or that he was armed and dangerous. He specifically faults the government for not calling any officers as witnesses who were interviewing the victims near the scenes of the robberies, and instead relying upon the radio dispatches' "conclusory assertions."

We disagree and hold that the radio dispatches could properly factor into the Fourth Amendment calculus. First, the radio reports themselves indicate that the officers speaking over the radio were obtaining information from face-to-face conversations with multiple victims and eyewitnesses within minutes of the alleged robberies and attempted robberies occurring. The government thus presented evidence about at least the type and rough number of sources from which the information originated, and the more or less real-time nature of the information lent it some reliability. *See Mayo*, 315 A.3d at 635 (discussing how courts must assess

"the recency . . . of the relevant criminal activity" in the reasonable articulable suspicion inquiry); *see also In re S.B.*, 44 A.3d 948, 952-53 (D.C. 2012) (surveying factors that establish the reliability of informants' tips). Crucial parts of the radio dispatches were also corroborated by Officer Savage and Officer Duckett's independent investigation leading up to the stop. The radio reports described the suspects as a group of two young males and two young females driving a white Nissan Rogue, with one of those females being Black and "wearing a red hoodie, a black bonnet, and black pants." The testimony and body-worn camera footage of Officers Savage and Duckett, meanwhile, showed that those officers observed a group of four people fleeing from a crashed white Nissan Rogue and saw E.A. with a young female matching that exact visual description. The radio reports thus possessed several indicia of reliability, warranting their inclusion in the reasonable articulable suspicion analysis.

We are unpersuaded by E.A.'s analogies to the facts of *R.W.* and *T.L.L.* to argue otherwise. In *R.W.*, the radio report was simply for a "suspicious vehicle," and we aptly described that broadcast as "so broad as to be useless" because it contained no information "whatsoever about what motivated the dispatch." 334 A.3d at 600-01. Only then did we conclude that the dispatch could be properly excised from the Fourth Amendment calculus. *Id.* And in *T.L.L.*, a broadcast identified a particular address as the place where some robbery suspects fled to, but

we excluded that piece of information from the analysis because absolutely "no . . . evidence was adduced" as to where the address came from. 729 A.2d at 341. Far more is known about the radio reports in this case, which from their contents plainly relayed contemporaneous reports from robbery or attempted robbery victims and other on-scene witnesses, allowing us to make a sufficient independent judgment regarding their nature and reliability.

Having determined that we may accord the radio reports some weight, we easily conclude that officers had a sufficiently particularized and objective basis that E.A. was involved in criminal activity with the group of people in the white Nissan Rogue. At the time E.A. was stopped, officers had strong reason to believe that he was a passenger in a stolen car that was involved in a series of robberies or attempted robberies, with those crimes occurring within about a mile of the stop[2] and less than thirty minutes beforehand. *See Mayo*, 315 A.3d at 621, 635 (considering whether there was "a report of criminal activity" as well as "the recency, frequency, and geographic proximity of the relevant criminal activity"). E.A. was also seen fleeing the erratically driven and ultimately crashed vehicle with a young female who exactly matched a detailed description of one of the robbery suspects, down to her

---

[2] *See Bruno v. W. Union Fin. Servs., Inc.*, 973 A.2d 713, 715 n.3 (D.C. 2009) (taking judicial notice of maps to identify distance between two places).

black bonnet and red hoodie, both fairly distinctive items of clothing. Given this context—i.e., E.A.'s active association with an apparent suspect, plus his tight connection to a stolen and recklessly driven vehicle—his flight had an extremely "incriminating" character and thus further "contributes to" the existence of reasonable articulable suspicion. *Id.* at 626-27 (affirming a contextual analysis of flight that asks "whether an individual defendant's flight evinced consciousness of guilt under the particular circumstances of the case").

A "person of reasonable caution" would interpret these core facts as pointing to E.A. as one of the "two males" that radio reports indicated had taken part in the robberies or attempted robberies. *Mayo*, 315 A.3d at 620 (quoting *Terry*, 392 U.S. at 22); *see also Maddox v. United States*, 745 A.2d 284, 289 (D.C. 2000) (finding reasonable articulable suspicion where police stopped a car that matched the broadcast description of a vehicle involved in a robbery that occurred a few minutes beforehand). That is justification enough for E.A.'s seizure.

E.A. identifies certain omissions in the mosaic of events that he argues cut against the existence of reasonable articulable suspicion. These include that (1) police "did not have continuous eyes" on the Nissan Rogue during the thirty-ish minutes between the last reported robbery and the helicopter's sighting of the car, so that perhaps he was a post-robberies addition to the car's passengers; and (2) there

was no description of a young male in a green jacket (what E.A. was wearing at the time of the stop) involved in the robbery or attempted robbery. Those points are surely some slight counterweights against a finding of reasonable articulable suspicion, but they do not meaningfully move the needle. As to the first point, people tend not to pick up unwitting passengers in the midst of crime sprees. *Cf. Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (noting that people engaged in obviously criminal activity are "unlikely to admit an innocent person with the potential to furnish evidence against him" into the mix). As to the second point, officers did not need "scientific certainty" that E.A. was involved in the robberies or attempted robberies to stop him—they are permitted "to make 'commonsense judgments and inferences about human behavior'" when assessing whether to stop someone for investigative purposes. *Glover*, 589 U.S. at 380-81 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). The officers in this case did exactly that as they assessed the very inculpatory information available to them about the car's passengers.

E.A.'s argument also runs into the fact that officers had another basis for stopping him: his presence in the reportedly stolen Nissan Rogue that drove recklessly—including by speeding through intersections and driving down the wrong side of the road—and the collective flight of the car's passengers after it crashed. These facts, while clearly not ironclad proof of unauthorized use of a

vehicle as a passenger, further amounted to reasonable articulable suspicion to justify a stop for investigation of that apparent crime. *See Bynum v. United States*, 133 A.3d 983, 987 (D.C. 2016) (describing "UUV-passenger" offense). Although we take E.A.'s point that the radio reports about the Nissan Rogue being stolen were conclusory,[3] those reports were corroborated by the circumstances in which officers saw the car. The car was erratically driven and quickly abandoned after the crash, and it is reasonable to assume that people are not likely to do such a thing to a car that is rightfully theirs. We have said before in the unauthorized use of vehicle context that "flight from the vehicle and the police after a crash may provide evidence of guilt." *Id.* at 987. So there was some meaningful independent corroboration that the car was indeed stolen, and officers could reasonably suspect that a passenger fleeing that car alongside its other passengers was at least aware of its stolen status.

---

[3] An officer on the radio dispatch said that the Nissan Rogue was reported "stolen" a couple of days prior, a point that was repeated by Officer Savage at the suppression hearing without much elaboration (he testified that he learned from other officers that the car was "a felony vehicle that was taken in another offense").

Officers also had a sufficient basis to believe that E.A. was armed and dangerous such that they could frisk him for weapons once stopped.[4] To justify a protective frisk, the officers needed merely a "reason to suspect that the person *may* be armed—not reason to believe he *is* armed." *Johnson v. United States*, 33 A.3d 361, 368 (D.C. 2011). And here, the police received reports that the Nissan Rogue passengers were recently involved in a series of robberies or attempted robberies, which are "violent crime[s]" that commonly involve the use of weapons. *Hicks v. United States*, 730 A.2d 657, 661 (D.C. 1999). It is true that one dispatcher said "right now no weapons" over the radio, and E.A. did not appear to make any suspicious gestures when he was stopped, but those facts do not preclude officers from having reasonable suspicion that E.A. was armed. They could quite reasonably believe that someone who would engage in such a crime spree, followed by a reckless getaway and bail out from a crashed vehicle, is reasonably likely to be armed with weapons. *See* Wayne R. LaFave, 4 Search & Seizure § 9.6(a) (6th ed. Nov. 2024 update) (noting that "awareness of recent erratic and aggressive conduct by the suspect" may indicate dangerousness).

---

[4] In so concluding we do not reach the parties' factual arguments about whether the trial court correctly concluded that the handgun fell out of E.A.'s sweatshirt pocket into the officers' plain view before the frisk occurred (thus conclusively showing that E.A. was armed and justifying the frisk).

When it comes to investigating violent crimes like robberies in real time, police officers must make "quick decision[s] as to how to protect themselves and others from possible danger," and thus "may reasonably assume" that those crimes "entailed the use of a weapon" as a general matter. *Hicks*, 730 A.2d at 661 (quoting *Terry*, 392 U.S. at 28); *see also Champion v. United States*, 307 A.3d 425, 434 (D.C. 2024) (noting that whether there was "a specific report of criminal activity" and whether the person is stopped for a "graver offense" are factors that may indicate someone is armed and dangerous (quoting *Jackson v. United States*, 56 A.3d 1206, 1214 (D.C. 2012))).  A one-time statement of "right now no weapons" was not any kind of fair assurance that the suspects were unarmed.  All things considered, officers had reasonable articulable suspicion that E.A. was armed and dangerous and were thus justified in frisking him for potential weapons.

### B. Police did not improperly exceed the bounds of a Terry stop.

E.A.'s final argument is that even if officers were justified in conducting a *Terry* stop and frisk, they exceeded the bounds of such a stop—transforming the stop into an arrest—when they drew their guns, yelled at E.A. to get down, and handcuffed him prior to frisking him.  If that's right, the government would need to justify the officers' arrest of E.A. prior to the patdown, otherwise the gun uncovered in the patdown would be the fruit of an unlawful seizure.  In order to justify the

arrest, the government would have to show that the officers had probable cause to arrest E.A., which would further give them justification to search him incident to a custodial arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("[A] search incident to the arrest requires no additional justification" beyond a "custodial arrest . . . based on probable cause."). The trial court rejected E.A.'s argument that he was unlawfully arrested on the grounds that officers indeed had probable cause to arrest E.A. for a litany of offenses. We do not reach that question because we conclude that officers did not exceed the bounds of a proper *Terry* stop in recovering the handgun in any event.[5]

Handcuffing alone will not convert a *Terry* stop into an arrest. Officers may sometimes handcuff a suspect in the midst of a *Terry* stop if they pose "an objective safety concern" or "there is some 'objective reason to believe' the suspect poses a distinct 'flight risk.'" *Brown*, 313 A.3d at 561 (quoting *Katz v. District of Columbia*,

---

[5] It is not clear to us that the trial court ruled on whether E.A.'s stop exceeded the scope of a *Terry* stop and amounted to an arrest prior to the gun's recovery. Regardless, even if we assume the court did not rule on that, we may affirm the court's ruling on alternative grounds if there is no procedural unfairness in doing so, and there is no procedural unfairness here where the parties presented evidence and argument as to whether E.A.'s seizure exceeded the bounds of a *Terry* stop prior to the gun's recovery before the trial court, and they have likewise briefed that issue before this court. *See BDO USA, LLP v. Jia-Sobota*, 283 A.3d 699, 710 (D.C. 2022) (acknowledging our "discretion to affirm the trial court's judgment on an alternative ground, so long as there would be 'no procedural unfairness' in doing so" (quoting *Jaiyeola v. District of Columbia*, 40 A.3d 356, 372 (D.C. 2012))).

285 A.3d 1289, 1306 (D.C. 2022)). While we have said that it is the "rare case" in which handcuffing will be justified for a mere investigatory stop, *id.* at 562 (quoting *Katz*, 285 A.3d at 1303), it was certainly justified here. We have already explained why E.A. posed a serious and objective safety concern in explicating why officers were justified in suspecting he was armed and dangerous, and E.A. had also already demonstrated that he was a serious flight risk by virtue of his immediately prior flight.

Those same concerns justified the officers in drawing their weapons, and the fact that they did so likewise did not convert his stop into an arrest. *See Hicks*, 730 A.2d at 660-61 (concluding that police did not transform investigative detention of robbery suspect into arrest when they approached with guns drawn, frisked him, and handcuffed him, explaining that "police may draw weapons if the 'suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is commonplace'" (quoting *United States v. Tilmon*, 19 F.3d 1221, 1227 (7th Cir. 1994))). Because E.A. does not point out any other circumstances that morphed his stop into an arrest before the discovery of the handgun—e.g., the duration of the stop or the degree of physical intrusion on his person—we conclude under the totality of facts that officers did not improperly exceed the bounds of a *Terry* stop and frisk, which was well supported by reasonable articulable suspicion.

### III. Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed.

*So ordered.*